550 So.2d 712 (1989)
STATE of Louisiana, Appellee,
v.
Nick TAYLOR, Appellant.
No. 20487-KA.
Court of Appeal of Louisiana, Second Circuit.
August 23, 1989.
Writ Denied January 12, 1990.
*713 Richard E. Hiller and John M. Lawrence, Indigent Defender Office, Shreveport, for appellant.
William J. Guste, Jr., Atty. Gen., Baton Rouge, Paul J. Carmouche, Dist. Atty., Catherine M. Estopinal and A.M. Stroud, III, Asst. Dist. Attys., Shreveport, for appellee.
Before MARVIN, FRED W. JONES, Jr. and HIGHTOWER, JJ.
HIGHTOWER, Judge.
Defendant, Nick Taylor a/k/a Nicky D. Taylor, was charged by indictment with first degree murder, a charge later amended to second degree murder. Following a jury trial, he was convicted of manslaughter. The state then filed a bill of information alleging defendant to be a third felony offender, LSA-R.S. 15:529.1, and he was so adjudged by the court. Life imprisonment without benefit of probation, parole, or suspension of sentence was imposed.
On appeal, defendant raises 82 assignments of errors; only two are briefed and the others are considered abandoned. State v. Schwartz, 354 So.2d 1332 (La. 1978); URCA 2-12.4. Both of the reserved assignments challenge pre-trial holdings. For the reasons hereinafter expressed, we affirm.
Just before 8 p.m. on February 9, 1984, seventeen-year-old Jonathan Sherman left his home in Bossier City. He was either walking or hitchhiking, and carrying a radio cassette player his mother had given him for Christmas. According to the state, young Sherman was picked up by the defendant in his 1981 Chevrolet pickup truck, *714 driven to a secluded place, and murdered by being shot twice. At trial, three important items of evidence presented by the state were the victim's radio cassette player, the murder weapon, and an unusual set of tire tracks found near the body.

ASSIGNMENT OF ERROR NO. 1
This assignment concerns the denial of defendant's motion to suppress all evidence seized from his home and pickup truck. Prior to trial, the issue was ruled on by this court after we granted writ applications to review the decision of the lower court. See State v. Taylor, 468 So.2d 617 (La.App.2d Cir.1985), writ denied, 472 So.2d 918 (La. 1985). Our opinion there set forth the following pertinent facts:
On February 10, 1984, the body of Jonathan Sherman was found near the Jimmie Davis Bridge in Caddo Parish. An autopsy revealed the victim died from two bullet wounds to the body.
On Sunday afternoon, February 12, 1984, Bill Gray, an investigator with the Bossier Parish District Attorney's Office, contacted Caddo Parish Chief Deputy Milton Almond and related information he had received from a confidential informant linking defendant with the murder and placing a portable radio/cassette player allegedly belonging to the victim in defendant's home in Bossier City.
Armed with this information, Almond assembled a `task force' of Caddo and Bossier law enforcement officers for a meeting in the Caddo Parish Sheriff's Office. Present at this meeting on the early evening of February 12 were Almond, Gray, J.W. Jones (chief investigator for the Caddo Sheriff's Department), Lt. Scotty Henderson (chief of detectives, Bossier City Police Department), Caddo Deputy Jimmy Crabtree (chief investigator on this particular case), and Caddo Deputy Richard Dunn.
During the meeting the information received by Gray and related to Almond was discussed and radio dispatcher, Doug Robertson, placed what was termed as a `routine' telephone call to the Bossier Parish Sheriff's Office to inquire whether that agency had any outstanding warrants for defendant. In response to the inquiry, Bossier Parish Deputy Sheriff Larry Sherrill checked the warrant file in the radio room and found what appeared to be an outstanding warrant slip. The slip referred to an old bench warrant (February 23, 1981) for failure to appear on an aggravated battery charge and had noted on it, `3-6-81 DA's office requests we hold up on this until 3-9-81 as he is to appear in court on this on that date.' Because of the age of the slip and its notation, Sherrill was somewhat dubious of the warrant's validity and informed Robertson that he wanted to check the matter with his shift commander and would call him back. Sherrill could not remember whether or not he in fact checked with his shift commander, but he talked to the radio operator and discovered no further reason to doubt the warrant's validity. Sherrill called Caddo Parish back and confirmed to Lt. Henderson that Bossier Parish did have an outstanding warrant for defendant's arrest and gave Henderson the pertinent information from the slip. Henderson, in turn, relayed this information to the group and the decision was made to arrest defendant on the outstanding warrant.
The evidence conclusively shows that the so-called warrant had in fact been recalled on March 9, 1981, when defendant appeared in court, pled guilty, and paid a fine on the aggravated battery charge. This information was of record and contained on the copy of the warrant slip filed in the Bossier Sheriff's records department. Furthermore, the radio room had been furnished this information via a `dead warrant' memo on March 9, 1981, which should have caused the radio room operators to pull the subject slip from the `active file' and place it in the `dead file.' Through error this had not been done.
Nevertheless, armed with the erroneous information Henderson received from Sherrill, the `task force' proceeded to the Taylor home on Kristen Street in Bossier City to arrest defendant. The *715 purpose behind this action was never clearly stated by the officers, but the trial court concluded that the officers `expected to arrest Mr. Taylor on the 1981 warrant ... and to search the home with Mrs. Taylor's consent, or if necessary to obtain a search warrant.' This conclusion is amply supported by the evidence.
At the time the officers proceeded to effect defendant's arrest, they did not have probable cause to arrest defendant on the murder charge, nor did exigent circumstances exist.
In route, the help of a uniformed Bossier City Policeman, Kevin Ross, was enlisted by radio and the group arrived at slightly different times in different cars around 9:00 p.m. Ross and Lt. Henderson approached the door and knocked. Nicky Taylor, his wife, Betty Sue Taylor, and a friend, Debra Riley, were inside eating dinner. Defendant answered the door. The officers asked if he was Nicky Taylor and he responded affirmatively. They informed defendant they had a warrant for his arrest for aggravated battery. By this time, Mrs. Taylor and Debra Riley had overheard and approached the doorway. Defendant and his wife told the officers that the aggravated battery charge had been disposed of by payment of a fine and that Mrs. Taylor had the receipt in her purse. This statement did not alter the situation and defendant began to remove items from his pockets and hand them to his wife. Defendant asked to see a warrant and the officers told him he could see it at the police station. Mrs. Taylor grabbed hold of defendant. The officers, according to the unrefuted testimony, then reached inside the residence, took hold of the defendant and pulled him out on the porch where he was handcuffed, frisked and then taken to the Bossier City Jail by Ross and Dunn and booked as a fugitive from Bossier Parish. Ross testified the time shown on the booking sheet, 9:14 p.m., was the actual time of the arrest.1 [footnote omitted.]
Concurrent with or immediately after defendant's departure, Henderson, Crabtree and Jones gained entrance to the Taylor home. The testimony is conflicting as to whether they were invited in by Mrs. Taylor or were simply admitted entry by her upon their request to talk with her. The evidence does not, however, show a forcible entry.
While Henderson, Crabtree, and Jones were in the Taylor residence, Almond and Gray remained outside in the vicinity of their vehicles to assist in any manner necessary.
The testimony as to what actually happened in the Taylor residence between 9:14 p.m. and approximately midnight is conflicting and certainly subject to diverse interpretations.
It is undisputed that Mrs. Taylor was initially upset and crying. She testified that her emotional state never improved because the officers in effect took control over her and her residence and that she simply functioned as a `robot' during the entire evening, obeying their every command. The officers, on the other hand, testified Mrs. Taylor made them coffee, fed them cookies, and cooperated by talking freely about her husband and helping them find the evidence seized. They admit she was upset in the beginning and to some extent throughout the evening, but testified her distress was emotionally caused by the fear that her husband or his family would retaliate against her for being cooperative.
Soon after the officers' entry into the living room, Mrs. Taylor was informed that her husband was a suspect in a murder. The officers requested that they be allowed to talk with Mrs. Taylor alone, and Debra Riley went into the master bedroom. The officers testified Mrs. Taylor talked about the defendant. Mrs. Taylor testified the officers began questioning her concerning her whereabouts and her husband's whereabouts on the date of the murder. The conversation in the living room was interrupted by a telephone call from defendant to his wife. Mrs. Taylor talked to her husband in the living room in the presence of the officers. Thereafter, the subject of the *716 ownership and presence of handguns came up and Mrs. Taylor proceeded to the master bedroom to retrieve two handguns she owned and show them to the officers. Henderson followed her. What happened in the bedroom is the subject of some dispute. Both Mrs. Taylor and Debra Riley testified that after Henderson was shown the two pistols, he took Mrs. Taylor by the arms, told her the officers were investigating a murder, knew she was lying and if she didn't talk with them he could charge her as an accessory after the fact. Henderson did specifically deny he touched Mrs. Taylor in the bedroom but was never asked on direct or cross-examination if he threatened her with arrest in the bedroom. However, all the officers, Henderson included, testified that they never threatened or coerced Mrs. Taylor. Henderson left the bedroom and returned to the living room and Mrs. Taylor and Debra Riley testified they remained in the bedroom for several minutes to allow Mrs. Taylor to regain her composure before returning to the living room. Mrs. Taylor and Debra Riley testified that, as they made their way to the living room, they both could hear loud noises in the attic of the residence.
After the two women rejoined the officers in the living room, Henderson testified Mrs. Taylor told him what her husband had done, started crying, put her arms around his neck; she said she feared for her life at the hands of her husband and his family, and requested help. Henderson stated he patted her on the shoulder and assured her she had nothing to worry about. Mrs. Taylor also attempted to give the officers a recorded statement but the recorder would not work properly. At 10:48 p.m., she signed a consent to search form. The officers testified she signed the form after reading it and that she was in no way threatened or coerced into doing so. Debra Riley's testimony does not indicate any threats, coercion, promises or inducements at the time of the signing of the consent to search and she knew that a permission to search was being signed.
Although the officers testified that the residence was not searched prior to the signing of the consent form, the trial court concluded otherwise and the record supports this conclusion. Both Mrs. Riley and Mrs. Taylor testified the residence was searched before the consent form was signed. In fact, they testified they believed the radio/tape player was found before Mrs. Taylor gave consent. Jones admitted that he went up into the attic to `get a view' but said he `didn't search.' Crabtree testified that the search which took place subsequent to the signing of the consent form, lasted about an hour or an hour and a half, and that the radio/tape player was found toward the end of the search. Other evidence, however, shows that Deputy James Hood was called to the scene to take photographs and arrived only a few minutes after 11:00 p.m. Hood testified that shortly after his arrival he was informed that the radio had been found.
All witnesses agreed that Mrs. Taylor's consent to search was not intended to include the pickup truck; yet, while Crabtree and Jones testified that they did not go into the pickup truck that night, this testimony was later shown to have been untrue. Crabtree so admitted. Chief Almond testified he observed Crabtree and Jones go into the truck. His subsequent internal investigation, prompted by the conflicting testimony, revealed that they had indeed done so and that Jones had removed a shotgun from behind the seat, shown it to Crabtree and replaced it.
Henderson, who found the radio/tape player in the attic, testified Mrs. Taylor went into the attic ahead of him and showed him where it was hidden. Mrs. Taylor admits going into the attic with Henderson, a fact really undisputed, but denies she showed him where the radio was. The trial court concluded, and that conclusion is not clearly wrong, that Mrs. Taylor did, in fact, reveal to Henderson the location of the radio.
During the interim between Nicky Taylor's arrest and approximately midnight, *717 the home, attic, garage and, to some degree, the interior of the pickup truck, were searched. The radio/tape player and some clothes were seized from the residence but no items were seized from the pickup truck that Sunday night.
After Lt. Hood arrived, he took photographs of the radio/tape player, clothes, boat and truck. The photographs of the truck were primarily of the tire tread design since Crabtree, upon his arrival, had noticed the unusual design of the tires and tread which matched the tire tracks found at the site where the body was discovered.
Around midnight, Mrs. Taylor left with Mrs. Riley and another friend, Shirley Ledbetter, in Ms. Ledbetter's vehicle, and proceeded to the Caddo Sheriff's Department where she gave a recorded statement. She was not forced to go and was not accompanied or escorted by any police officer.
Shortly after Mrs. Taylor left, a tow truck called by Deputy Almond arrived and towed the pickup truck to the Caddo Parish Sheriff's Academy. Mrs. Taylor knew the truck was going to be impounded and had given the door keys to the officers. She testified she did not have a key to the ignition.
Mrs. Taylor returned home around 1:00 a.m. on February 13 with Ms. Ledbetter and Mrs. Riley. Mrs. Riley spent the night with her. Mrs. Taylor did not visit her husband at the Bossier City Jail that day, made no effort to try to bond him out, and did not present her receipt proving payment of the aggravated battery fine to the authorities. She did not testify that she considered or attempted to seek legal counsel as a result of the activities of the night before. Around 2:00 p.m. on February 13, Henderson, Crabtree and Deputy Strother came back to her residence and again obtained her signature on a consent to search form. The officers testified they did not threaten or coerce her into signing this consent form and that no promises or inducements were made to obtain her consent and signature. The residence was again searched in hopes of finding the victim's glasses and the murder weapon. However, the search turned up nothing.
Later that evening, a warrant was issued for the defendant's arrest for first degree murder and he was arrested and transferred to the Caddo Parish jail.
Search warrants for the pickup truck, pursuant to Crabtree's affidavit in support thereof, were issued on February 13, 14 and 15, 1984. The warrant issued on the 13th resulted in the seizure of a bullet holder with six live rounds of .380 caliber bullets, vacuum cleaner gleanings from the floorboard and seat and soil samples from the rear wheels. The shotgun that had been handled by the officers was seized pursuant to the February 14 warrant.
After a hearing on the motion to suppress, the trial court refused to suppress the evidence taken from the Taylor residence on the night of defendant's arrest, reasoning that Mrs. Taylor's consent to search was obtained by means sufficiently distinguishable from any police misconduct, including use of an invalid arrest warrant, so as to be purged of the primary taint. Also, the motion was denied as to evidence relating to defendant's pickup truck tires and their tread design since these were in plain view and defendant possessed no legitimate expectation of privacy in items left in his driveway. However, the trial court granted defendant's motion insofar as it concerned evidence seized from the pickup's interior on either the night of the arrest or the following day.
Our court granted writ applications by the state and defense. In the opinion from which the above facts are quoted, we partially reversed the trial court's ruling and held that all the disputed evidence was admissible. As reflected in the citation of that opinion, the Louisiana Supreme Court declined to review the holding.
According to our court, it was difficult to conclude that Mrs. Taylor's consent to search, signed on February 12, did not arise through exploitation of previous illegalities. However, at 2:30 p.m. on the date following defendant's arrest, Mrs. Taylor executed a second consent form *718 which gave permission for a search of the premises. We concluded the circumstances clearly established that the second consent was free and voluntary and not causally related to any previous illegality. Under the relevant jurisprudence, the voluntary consent validated prior searches of the residence which we had determined to be of dubious legality. 468 So.2d at 629.
The February 13 search of defendant's pickup, pursuant to a warrant, yielded several significant pieces of evidence. However, the affidavit in support of the search warrant contained misrepresentations of fact. Specifically, the affiant had sworn that the truck was moved to the Caddo Parish Sheriff's Academy with no disturbance of its interior. That representation was false since testimony established that officers were improperly inside the vehicle on the night of defendant's arrest. Thus, the warrant was invalid.
This court nevertheless upheld the legality of the search, finding applicable the "automobile emergency" exception to the warrant requirement. The informant's tip implicating defendant in the homicide, together with the truck's unusual tire tread matching the tracks found near the victim's body, established probable cause to believe the vehicle contained evidence pertaining to the crime. Likewise, exigent circumstances existed since defendant, whose offense was then bondable, could have returned and taken evidence from the truck or moved the vehicle altogether. Also, Mrs. Taylor could have disposed of the truck's contents. Since a warrantless search of the truck at the residence would have been legally acceptable, the automobile emergency exception continued to validate a search at the place of impoundment. 468 So.2d at 632.
Thus, after carefully analyzing the issues at that time, this court ultimately found admissible all of the evidence to which the motion to suppress had been directed. Yet, we are now asked to abandon our reasoned and considered holding. We decline to do so.
An appellate court will not overturn its pretrial determination of admissibility unless the defendant presents new evidence tending to show the decision was patently erroneous and produced an unjust result. State v. Johnson, 438 So.2d 1091 (La.1983); State v. Humphrey, 412 So.2d 507 (La.1982) (on reh'g); State v. Scott, 543 So.2d 631 (La.App. 1st Cir.1989); State v. Butler, 462 So.2d 1280 (La.App. 5th Cir. 1985). Testimony bearing on the suppression issue was again adduced at trial, but in no significant or substantive fashion did it differ from the pretrial evidence. Additionally, neither in argument nor brief does defendant point to any new evidence tending to demonstrate any unjustness or error in our prior determination. Accordingly, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 3
In this assignment, defendant asserts various complaints concerning testimony by his former attorney, Randall Fish, about the murder weapon, a gun. That testimony was the subject of even more extensive pretrial litigation than the suppression issue, both in this court and the Louisiana Supreme Court.
On the day after his arrest, defendant met with Fish in the Bossier City jail. Later than day, Fish went to defendant's home and retrieved a Ceska CZ .380 caliber pistol from the attic. Fish kept the gun at his office almost two years, until January 20, 1986, when he relinquished it to police authorities who confronted him after learning of the weapon's whereabouts through an informant's tip.
Defendant filed an "In Limine Motion," invoking the attorney-client privilege and asking for suppression of the pistol and any evidence relating to it. His motion was denied, and this court declined to disturb that ruling. See State v. Taylor, 482 So.2d 210 (La.App. 2d Cir.1986). Our Supreme Court granted a writ application and initially held that Fish could not be called as a witness concerning the gun. See State v. Taylor, 483 So.2d 1007 (La.1986). However, that position was modified on rehearing. See State v. Taylor, 502 So.2d 534 (La.1986) (on reh'g). And ultimately, on second rehearing, the court enunciated *719 both the procedural and substantive requisites for vitiation of the attorney-client privilege. The gun was admissible, the court stated, provided a proper foundation were laid. More importantly, though, communications between Fish and defendant were said to be unprotected by the privilege if they were made as part of a conspiracy to secrete relevant evidence. The state was cast with the burden of proving, by a preponderance of the evidence and unaided by any of the allegedly privileged communications, that such a conspiracy existed. See State v. Taylor, 502 So.2d 537 (La. 1987) (on 2d reh'g).
Upon remand, the trial court conducted an evidentiary hearing and found that the state had properly and sufficiently proven that Fish and defendant had conspired to hide the weapon. In written reasons, the trial judge noted testimony by Mrs. Taylor that Fish called her at home the day after the arrest and inquired whether the police had visited yet that day. He subsequently came to the residence and went into the attic, admonishing Mrs. Taylor, in effect, not to accompany him so that she could not be called upon to recount what she might see. Two to three minutes later, Fish descended from the attic carrying defendant's black zipper bag and left the premises with that case.
The trial court further noted that a family friend, Ms. Debra Riley, was present part of the time when Fish was at the Taylor home. She was told to watch the living room door while Fish and Mrs. Taylor went through the kitchen to the garage. Soon Ms. Riley heard noises in the attic and then observed Fish and Mrs. Taylor near his vehicle.
It was additionally observed that Mrs. Taylor had combed the attic for the gun, without success, on the morning of Saturday, February 11, 1984, the day before defendant's arrest. Similarly, the police had extensively searched the premises and had not recovered the weapon. Fish, however, was able to find the gun in only a few minutes, a fact strongly supporting the inference that defendant had disclosed to him its location. Finally, of course, evidence established that the gun was found in Fish's office.
Fish testified that no conspiracy existed. He claimed that he and defendant had not discussed hiding the weapon; and that Mrs. Taylor, who had asked him to visit defendant at the jail, requested that he remove the gun from the residence once he located it. The trial court stated it did not believe Fish. Nevertheless, it explained that his testimony did not weigh against the defendant because of the Supreme Court instruction that such supposedly privileged communications were not to be considered in reaching the preponderance level.
This court denied defendant's writ application. We found the trial court did not err in holding that the communications between defendant and Fish were not protected by the attorney-client privilege, and that the state could summon Fish to testify.
The Supreme Court likewise denied writs and succinctly stated the following:
PER CURIAM.
Writ denied.
Pursuant to an order from this court, the trial judge conducted a pretrial hearing on the admissibility of the attorney-client communications. The evidence credited by the trial judge established that the communications, more probably than not, were made in pursuit of a criminal act of conspiracy to hide the apparent murder weapon and are not protected by the attorney-client privilege.

See State v. Taylor, 511 So.2d 1141 (La. 1987) (emphasis added).
Our review of the record satisfies us of the correctness of the earlier view taken by the trial court and this court concerning the attorney-client privilege issue. Further, defendant has called no new evidence to our attention, and we have discovered none, which would necessitate a retreat from our previous holding. See State v. Johnson, supra; State v. Humphrey, supra; State v. Scott, supra; State v. Butler, supra. Thus, defendant's complaint concerning the gun and Fish's testimony in relation thereto is without merit.
*720 Defendant also contends that prior to his testimony at trial Fish was improperly permitted to waive his Fifth Amendment privilege against self-incrimination outside the presence of the jury. Of course, it is improper for either the prosecution or the defense knowingly to call a witness who will claim a privilege, for the purpose of impressing upon the jury the fact of the claim of privilege. State v. Berry, 324 So.2d 822 (La.1975), cert. denied, 425 U.S. 954, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976). While in this case the witness waived, rather than invoked, the privilege, defendant doubtless wanted the jury to draw some inference from that action. At any rate, we need not long concern ourselves with defendant's contention about the waiver out of the jury's presence, because the error, if any occurred, was of no moment. Both the witness' waiver of his Fifth Amendment privilege, as well as his possible criminal behavior in hiding the gun, were brought to the attention of the jury during his testimony.
Finally, defendant complains that a portion of Fish's testimony, about an encounter with the authorities immediately preceding his delivery of the gun, was hearsay or, if admissible, was irrelevant. The challenged testimony occurred in the context of Fish's description of a visit made to his residence by an official of the Bossier Parish District Attorney's Office. The following trial interchange occurred:
A. I was ill at the time. He came to the door and initially inquired about how I was feeling. I told him I was sick. He said he needed to talk to me. I said, "Well
MR. GIDDENS: Your Honor, I would object as to hearsay.
MR. CRICHTON: Well, I am not sure if this is offered for the truth of the matter, but I think it is offered to explain what action Mr. Fish then took and why he took the action.
THE COURT: You may proceed only along those lines.
MR. GIDDENS: I would object as to the relevancy of that hearsay exception.
MR. CRICHTON: It is very relevant.
THE COURT: Objection is overruled.
Hearsay is testimony in court of a statement made out of court, the statement being offered to show the truth of the matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter. State v. Hayes, 414 So.2d 717 (La.1982). Clearly the testimony here was propounded to explain the impetus for Fish's action, not for the truth of the statements. In addition, the circumstances surrounding Fish's encounter with the official responsible for retrieving the weapon were certainly relevant to the case.

CONCLUSION
For the foregoing reasons, defendant's conviction and sentence are affirmed.
AFFIRMED.