907 So.2d 200 (2005)
STATE of Louisiana, Appellee
v.
Tony Lavelle HUNTER, Appellant.
No. 39,664-KA.
Court of Appeal of Louisiana, Second Circuit.
June 29, 2005.
*202 Louisiana Appellate Project by Christopher A. Aberle, Mandeville, for Appellant.
Tony Lavelle Hunter, Pro Se.
Jerry L. Jones, District Attorney, J. Michael Ruddick, Assistant District Attorney.
Before CARAWAY, PEATROSS & DREW, JJ.
PEATROSS, J.
A jury found Tony Lavelle Hunter ("Defendant") guilty on three counts of second-degree murder and one count of attempted armed robbery. The trial court sentenced Defendant to serve three consecutive terms of life imprisonment at hard labor without benefit of probation, parole or suspension of sentence for the murders and another consecutive term of 49 years at hard labor without benefits for the attempted armed robbery. Defendant now appeals his convictions and sentences. For the reasons set forth herein, Defendant's convictions and sentences are affirmed.

FACTS
These murders happened late in the evening of March 10, 2001, at a home on Greenwood Drive in the Tanglewood Heights subdivision of Monroe, Louisiana.[1] The adult victim, 24-year-old Levi Williams ("Chico"), lived at the home with two other adults, Anthony Rodgers ("Anthony") and Harold Black ("Harold")[2], and a 16-year-old boy, Henry Staten ("Henry"), who was Anthony's godson.
On the evening of March 10, 2001, Anthony held the opening night for his new nightclub, "Club Daddy's," on Ticheli Road in Monroe, Louisiana. Anthony's first cousin, Douglas Simons ("Douglas"), came to Monroe to help him with opening night at the club and was staying with him at 221 Greenwood Drive.
Early that evening Chico, Douglas, Harold and Henry left 221 Greenwood Drive and went to Club Daddy's to assist Anthony with its operation. During the evening, *203 after the club became crowded with patrons, Anthony sent Douglas on an errand to obtain change for patrons paying the club's cover charge. Douglas left in Anthony's car and traveled to two gas stations seeking the needed change, but was unsuccessful. In the meantime, because Douglas had not returned, Anthony sent Chico to 221 Greenwood Drive to retrieve change. Chico left the club driving his white Ford Explorer.
Before Chico arrived at the home, Anthony's sister, Emma Rodgers ("Emma"), drove by 221 Greenwood Drive on the way to her mother's house, located on the same street.[3] She had been at work and was on the way to pick up her children, after which she intended to return home. She did not see any vehicles at 221 Greenwood Drive, so she did not stop. She did, however, notice a red Ford F-150 pickup truck with one non-functioning headlight and dark-tinted windows headed toward the home.[4] She did not recognize this truck and had not seen it in the neighborhood before.[5]
Chico drove to 221 Greenwood Drive and parked in the yard in front of the door as was his custom. Chavez Staten ("Chavez") and Jeremy Staten ("Jeremy"), both eleven years old, were staying alone in the home at this time.[6] After Chico arrived at the home to get change, Emma, on her way back from her mother's house, drove back past 221 Greenwood Drive on her way out of the neighborhood. As she drove by, she noticed Chico's white Explorer parked in the yard; but, because her children were asleep in the car, Emma decided not to stop and visit. She did, however, note that no lights were on in the house at the time.
When Chico did not return and did not answer his cell phone, Henry and Douglas drove to 221 Greenwood Drive to check on him. Henry opened the front door with his key and saw Chavez and Jeremy lying on the floor, both shot in the head. Henry ran from the house to the car to get Douglas, who then went into the home and saw the children. The pair then left the home and used their cell phone to call Anthony and the police.
Upon receipt of the news, Anthony and several others went to the scene. Harold entered the house, armed himself with his.45-caliber pistol and searched for a possible assailant. During their search of the house, the group found Chico lying on the floor of the bedroom, also shot in the head. Chavez, Jeremy and Chico were transported to a nearby hospital, but all three died from their gunshot wounds.[7]
*204 Ouachita Parish Sheriff's Office ("OPSO") Deputies David Godwin and John Spires responded to the scene. Deputy Spires secured Harold's pistol and detained him temporarily during the investigation. Harold's gun and ammunition excluded, scene investigators found five live .22-caliber cartridges, four spent.22-caliber cartridge cases, three spent.45-caliber cartridge cases and a live .45-caliber cartridge on the floor of the house. Deputies also found a box of live .45-caliber cartridges in a desk. The spent.45-caliber shell casings found on the floor were the same brand as those in the box of live cartridges found in the desk. The OPSO also found a small safe, three rifles, a set of keys, a set of digital scales and a bag full of what appeared to be marijuana.[8] No usable finger or tire prints were discovered. The deadbolt on the open front door was in the locked position; however, the door facing was damaged as if it had been forced open.[9] The OPSO canvassed the neighborhood seeking leads for its investigation, but none of the residents provided any assistance. Douglas informed police that the word on the streets was that someone nicknamed "Fats" or "Fat" had committed the crime.
On May 4, 2001, Defendant was arrested on an unrelated offense  the unauthorized use of a moveable (the aforementioned red Ford F-150 truck, which he had leased on March 7, 2001; the arrest was not referenced at trial).[10] Defendant was incarcerated at the Ouachita Correctional Center ("OCC") on the unauthorized use charge. During his incarceration, he made statements related to the Greenwood Drive murders within earshot of three different inmates. The testimony of these inmates was, ultimately, the evidence that directly linked Defendant with the crime.
Defendant obtained a copy of one of the statements (that of inmate Christopher Wiggins), but not those of the other two inmates. On writs, this court ordered the trial court to review the statements at trial to determine whether the defense was entitled to them.[11] The trial court ultimately ordered that the State give the other two statements to the defense in order to provide for a complete cross-examination.
The first of the inmates to testify was Vaccara Comanche, who was incarcerated at OCC at the same time as Defendant.[12] *205 Comanche testified that no one had promised him anything for his testimony. Comanche testified that Defendant's street name is "Trigger." He further testified that he had overheard a conversation between Defendant and another inmate, Glen Dale Nelson[13], conducted through a cell window when Defendant was outside in the recreation yard. Comanche further testified that he heard Defendant ask Nelson "who he was running his mouth to ... and all them types of questions like that...." Comanche testified that Defendant told Nelson "he ain't got nothing to worry about the weapon. It can't lead back to him and all that." Comanche said that he overheard that the weapon being discussed was a .22.
Comanche also testified that Defendant stated that "Chico" was the only one who was supposed to be in the house. In addition, Comanche said that he overheard Defendant say, in reference to the children, that "he had to chase the little f* *kers around the house." Comanche testified that Defendant said that he had been to the residence "a couple of other times" prior to the murders and that the children "had seen his face ... they recognized who he was."[14]
The second of the inmates to testify was Christopher Wiggins.[15] He made no indication that he had not received any leniency in exchange for his testimony. Wiggins was incarcerated with Defendant in an "isolation cell" for two months. He confirmed Comanche's statement that Defendant's nickname or "street name" was "Trigger" and identified him in court. Wiggins testified that Defendant told him that the crime was "a robbery" in the Tanglewood area and that three people were killed. He testified that Defendant stated that he got into the house by kicking the door in and further stated that Defendant said "[the children] seen his face upon him leaving out the house, and he couldn't leave no witness behind so he had to kill them." Finally, Wiggins testified that Defendant said "he went to rob them and the guy didn't want to ... show him where the drugs and money was so he shot him."[16]
The final inmate to testify was Clarence Kennedy.[17] Kennedy stated that he had *206 not asked the State for "help" regarding his sentencing in exchange for his testimony. Kennedy testified that he was in his cell at OCC when Defendant, who was in the recreation yard, came up to the window and asked Kennedy to go get Glen Dale Nelson. Kennedy did not refer to Defendant as "Trigger." Kennedy testified that he overheard the conversation between the pair and said that Defendant asked Nelson, "What did you tell? What did you say, because the police, they know too much." Kennedy further testified that Defendant said "The kids ain't suppose to be there" and "Where the kid come from, they ain't suppose to here." Kennedy stated that, while listening to the conversation, he learned that the event was a robbery and heard Defendant say that "he had to do [the children] too." Kennedy also learned from the conversation that there was a lookout for the robbery outside the house who came inside the house when he heard the children and said "you got to do them too."
On October 17, 2002, the State formally charged Defendant by indictment with three counts of second-degree murder and one count of armed robbery of Chico.[18] Defendant filed a variety of pretrial motions. The court held Defendant's preliminary examination on December 19, 2003.[19]
Defendant's attorney filed a motion in limine seeking to prevent the State from referring to Defendant's street name, "Trigger," in the jury's presence. Defendant alleged that this was not his nickname and argued that the use of the nickname would be inappropriate, unfair, extremely prejudicial and a violation of his rights to due process and a fair trial. On January 16, 2004, the court held a hearing on this motion. The witness interviews taken in conjunction with this investigation contained numerous references by a variety of different witnesses to Defendant by his nickname "Trigger." Further, at the preliminary examination and bond reduction hearing, Investigator Harris stated that, early in the investigation, one of the victim's relatives told him that she had heard "on the streets" that the perpetrators of this crime were "Trigger" and "Little J." Jacqueline Staten ("Ms. Staten") made the following statement:
She [Jacqueline Staten] stated that she has heard rumors that either "Little J" or "Trigger" may have committed the murders. She stated she has not heard those names before and does not know these two people, at least by those names.
*207 Similarly, police reports produced in this matter reflect the following contact with Emma:
On 3-26-01 I made contact with Emma Rodgers by telephone. Emma stated a week or so after the homicides occurred that "Trigger" drove up into the parking lot of her business (Shell station at 3405 Desiard) and parked. Emma stated that he was driving a new red truck and the truck he was driving was the same one she saw on Greenwood Drive the night of the homicides. Emma stated she was sure it was the same truck, that it was a shiny red extended cab with tinted windows.
Emma advised she only knew the black male she identified as Trigger by his street name and she had seen him before on several occasions; however, this was the first time she had seen him driving the red truck....
The court concluded that the State could use the nickname at trial as proof of identification. The court offered to give a limiting instruction in conjunction with its ruling, but no such instruction was requested. At trial, the State referred to Defendant as "Trigger" in both its opening and closing statements. In its questioning of witnesses, the State did not ask the witnesses the meaning or significance of the nickname, but did refer to Defendant as "Trigger." There was no witness who identified Defendant solely by the nickname and neither Ms. Staten nor Emma said that they only knew Defendant as "Trigger." On cross-examination, defense counsel read part of a statement where the officer/questioner referred to Defendant as "Trigger." The police reports were not offered into evidence. In another hearing pertaining to the disclosure of witness' statements, held outside the presence of the jury, but after the court's ruling on the issue, Detective Richard Medaries said that the OPSO investigation "initially identified a person ... called `Trigger,' who we... identified as being [Defendant]."
The trial concluded on March 4, 2004, and the jury returned guilty verdicts on all three counts of second-degree murder and returned a responsive verdict of guilty of attempted armed robbery. Defendant filed a motion for a post-verdict judgment of acquittal and a motion for a new trial, each of which was denied on May 20, 2004.
On May 25, 2004, Defendant came before the court for sentencing. After reviewing Defendant's pre-sentence investigation, which revealed a history of convictions for possession of cocaine with intent to distribute, possession of cocaine and failure to return a leased vehicle and multiple arrests for violent behavior, the court sentenced Defendant to serve three consecutive terms of life imprisonment at hard labor without benefit of probation, parole or suspension of sentence and another consecutive term of 49 years at hard labor without benefit of probation, parole or suspension of sentence for the attempted armed robbery. The court further designated the murders as crimes of violence and the attempted armed robbery as an attempted crime of violence, and denied Defendant any eligibility for diminution of sentence for good behavior. Defense counsel verbally objected to the sentences as constitutionally excessive in both their length and in their consecutive imposition and filed a motion for reconsideration of sentence, which the court subsequently denied.
Defendant now appeals, urging two assignments of error through counsel and three pro-se assignments.

*208 DISCUSSION

Pro-Se Assignment Number One (verbatim): The Defendant's convictions were found upon circumstantial evidence which did not exclude every reasonable hypothesis of innocence, in violation of the Fourteenth Amendment of the U.S. Constitution.
This court must accept and consider a pro se or represented defendant's briefed assignments of error. La. Const. art. I, Sections 2, 19 and 22; State v. Melon, 95-2209 (La.9/22/95), 660 So.2d 466; State v. Anderson, 29,282 (La.App. 2d Cir.6/18/97), 697 So.2d 651. Defendant's trial counsel made a motion for post-verdict judgment of acquittal under La. C. Cr. P. art. 821, which the trial court denied. Defendant himself now seeks appellate review of the question of the sufficiency of evidence to convict him.
La. R.S. 14:30.1 provides, in pertinent part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm....
La. R.S. 14:64 provides, in pertinent part:
A. Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
La. R.S. 14:27 provides:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
To convict a defendant of attempted armed robbery, the state must prove that the defendant, having the specific intent to commit armed robbery, did or omitted an act for the purpose of and tending directly toward the taking of anything of value belonging to another, from the person of another or in the immediate control of another, by the use of force or intimidation, while armed with a dangerous weapon. La. R.S. 14:27 and 64; State v. Musgrove, 33,977 (La.App. 2d Cir.12/15/00), 774 So.2d 1155, writ denied, 01-0356 (La.9/28/01), 798 So.2d 112.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court must first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App. 2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
The Jackson, supra, standard is applicable in cases involving both direct and circumstantial evidence. State v. Sutton, 436 So.2d 471 (La.1983). An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. State v. Owens, 30,903 (La. App. 2d Cir.9/25/98), 719 So.2d 610, writ *209 denied, 98-2723 (La.2/5/99), 737 So.2d 747. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. Sutton, supra.
This court's authority to review questions of fact in a criminal case does not, however, extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). It is always the function of the judge or jury to assess credibility and resolve conflicting testimony. State v. Robinson, 33,720 (La. App. 2d Cir.6/21/00), 764 So.2d 190; State v. Thomas, 609 So.2d 1078 (La.App. 2d Cir.1992), writ denied, 617 So.2d 905 (La. 1993). A reviewing court accords great deference to a judge's or jury's decision to accept or reject the testimony of a witness in whole or in part. State in Interest of MSS, 612 So.2d 959 (La.App. 2d Cir.1993); State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir.1986), writ denied, 499 So.2d 83 (La.1987). In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, 28,095 (La.App.2d Cir.5/8/96), 674 So.2d 1018, writs denied, 96-1459 (La.11/15/96), 682 So.2d 760, 98-0282 (La.6/26/98), 719 So.2d 1048.
In the case sub judice, the jury heard witnesses testify that they heard Defendant confess to committing the Greenwood Drive murders and the attempted robbery. Confessions, unlike mere admissions, are direct evidence of guilt. La. R.S. 15:449; State v. McNeal, 34,593 (La.App. 2d Cir.4/4/01), 785 So.2d 957. Defendant restates the argument made at trial that the testimony of these witnesses was not credible and could not support his convictions. As in State v. Robinson, XXXX-XXXX (La.4/14/04), 874 So.2d 66, cert. denied, ___ U.S. ___, 125 S.Ct. 658, 160 L.Ed.2d 499 (2004), however, the jury in the case sub judice heard, in great detail, the prior convictions and sentences of the inmate witnesses and, likewise, heard the possibility for favorable treatment the inmates might receive by testifying. La. C.E. art. 607(D)(1); see also State v. Divers, 38,524 (La.App. 2d Cir.11/23/04), 889 So.2d 335, writ denied, 04-3186 (La.4/8/05), 899 So.2d 2.
The record reflects that Defendant's attorney gained access to the pretrial statements of the inmate witnesses and pointed out several arguable instances of variation between their original statements and their testimony at trial. Accordingly, Defendant was fully afforded the right to cross-examine these witnesses. Moreover, nothing in the record indicates that these witnesses were acting on behalf of the government.
The jury heard the testimony of three witnesses who overheard Defendant confessing to these murders. Both Wiggins and Kennedy further testified that Defendant said that he intended to commit robbery and said that he admitted shooting Chico when the latter would not show him where he kept drugs or money. Further, the evidence reflects that each of the victims was shot at least once in the head by the same type of weapon that Defendant claimed to have used.
Given the above, we find Defendant's confession to the inmate witnesses was sufficient to prove all of the elements of second-degree murder for all three victims, as well as the attempted armed robbery of Chico. All of the elements of the crimes were proven by direct, rather than circumstantial, evidence, so there is no *210 need to examine the evidence under the standard of La. R.S. 15:438, the circumstantial evidence rule. For these reasons, we reject this assignment of error.

Assignment of Error Number One (verbatim): The district court violated both the rules of evidence and [Defendant's] right to due process by allowing the State to refer repeatedly to [Defendant] as `Trigger,' though such evidence was irrelevant.
The trial court relied on State v. Edwards, 97-1797 (La.7/2/99), 750 So.2d 893, cert. denied, 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999), in its ruling allowing references to Defendant's nickname. In Edwards, supra, a defendant nicknamed "Gunslinger" was convicted of first-degree murder and sentenced to death. One living victim of the crime recognized the defendant as the perpetrator, but only knew him by his street names "Gunslinger" and "Skeeter." This victim and another victim later identified the defendant in photo lineups and at trial. The State referenced the nickname "Gunslinger" at trial, over the objection of the defendant. The supreme court concluded that referring to the defendant as "Gunslinger" was permissible in light of the contested issue of identity in the case. The court went on to state that the nickname was relevant to show the identity of the defendant as the perpetrator of the crime and the process by which the police identified the defendant as the perpetrator.
In the case sub judice, Defendant contends that identity was not at issue in a manner that would permit reference to his nickname, "Trigger," before the jury. None of the witnesses identified Defendant exclusively by his nickname. The street names of various persons did, however, form an important part of the lengthy investigation that ultimately led police to Defendant. The jury heard only a portion of the evidence relating to the investigation and to the information that identified Defendant as the perpetrator; however, much of the development of the case and the investigative leads naming "Trigger" as the killer were not presented to the jury. Investigators Harris and Medaries did not testify regarding the witnesses who identified "Trigger" as the subject of street talk regarding the crime.
The jury did, however, hear evidence from Douglas to the police that he heard someone nicknamed "Fats" was involved in the murders. The jury was also made aware of the long period between the murders and the apprehension of Defendant. It also repeatedly heard that no one in the Tanglewood Heights subdivision could (or would) provide police with leads to identify the perpetrator of these murders.
Regardless, it is inescapable that Defendant's nickname was, in fact, crucial in identifying him to police during the investigation. Further, the nickname was relevant as a piece of evidence tending to verify the inmate witnesses' identification of Defendant as the person that they overheard talking about committing the murders at issue.[20] The jury was instructed to consider only the evidence presented at trial in making its determinations. Accordingly, we find the use of the nickname to be relevant and not prejudicial. For these reasons, we reject this assignment of error.

*211 Assignment of Error Number Two (verbatim): The court denied [Defendant's] state and federal constitutional right to present a defense by not allowing him to examine Captain Harris about [Defendant's] pre-arrest offer to assist in the investigation in any way possible, including by taking a lie-detector test.

As noted, this court denied Defendant's emergency writ on this issue during the trial. This court's order stated:
WRIT DENIED; STAY ORDER DENIED.
The statements by the defendant to the officer are exculpatory hearsay, and, because made after the offenses, are irrelevant to any showing of "state of mind." The statements are not admissible under any exception to the hearsay rule. The trial court ruling is correct. The writ is denied.
In many instances, a court will not revisit an issue on appeal that has previously been decided on a writ application. State v. Humphrey, 412 So.2d 507 (La.1982) stated, in part:
When this court considers questions of admissibility of evidence in advance of trial by granting a pretrial application for supervisory writs (rather than deferring judgment until an appeal in the event of conviction), the determination of admissibility does not absolutely preclude a different decision on appeal, at which time the issues may have been more clearly framed by the evidence adduced at trial. Nevertheless, judicial efficiency demands that this court accord great deference to its pretrial decisions on admissibility, unless it is apparent, in light of the subsequent trial record, that the determination was patently erroneous and produced an unjust result.
See also State v. Taylor, 550 So.2d 712 (La.App. 2d Cir.1989), writ denied, 556 So.2d 54 (La.1990).[21]
On appeal, Defendant reurges that his expression of desire to take a polygraph test was probative of his state of mind and that the ruling preventing him from putting on this evidence denied him the right to present a defense. Nothing that transpired during the remainder of the trial, however, compels a different result on this issue on appeal. La. C.E. art. 801 provides, in part:

*212 D. Statements which are not hearsay. A statement is not hearsay if:
(2) Personal, adoptive, and authorized admissions. The statement is offered against a party and is:
(a) His own statement, in either his individual or a representative capacity....
In State v. Freeman, 521 So.2d 783 (La.App. 2d Cir.1988), writ denied, 538 So.2d 586 (La.1989), this court stated:
Generally, any out-of-court statement of the accused constitutes hearsay unless subject to an exception. Such a statement is admissible as an exception to the hearsay rule when it is an admission against interest. Thus, the defendant may not introduce his own self-serving exculpatory statements because they are hearsay.
Defendant's alleged offer (if indeed the person who spoke to Investigator Harris on the phone was Defendant) to take a polygraph test was clearly an attempt to exculpate him. Evidence about his offer to take such a test would be self-serving and, as this court recognized, supra, is irrelevant to Defendant's state of mind, assuming, arguendo, this state of mind after the offense was a relevant question.[22] For the reasons set forth herein, we reject this assignment of error.

Pro-Se Assignment of Error 2 (verbatim): The consecutively imposed sentences are in violation of the Sixth and the Fourteenth Amendments of the U.S. Constitution, based in part on facts found by the sentencing court and not the jury.
In Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), the United States Supreme Court applied the rule announced in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000):
Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.
To this end, Defendant argues that his sentences run afoul of this prohibition.
The record in the case sub judice reflects that Defendant was sentenced appropriately for each count of second-degree murder and his 49-year hard labor sentence was within the statutory range of up to 49.5 years for attempted armed robbery. Accordingly, Apprendi, supra, does not apply to Defendant's case. Defendant does not argue in brief that his sentences are constitutionally excessive, nor could they be considered excessive given the heinous nature of the Greenwood Drive murders. For the reasons set forth herein, we reject this assignment of error.

Pro-Se Assignment of Error 3: The instructions of the law to the jury on the one law of "accessory after the facts" erroneously informed the jury that if it found defendant was an accessory after the fact, but not guilty as a principal, they must find Defendant not guilty.
Defendant next argues that the trial court's instructions to the jury on the law of principals and accessories were improper. He states that the court should not have instructed the jury that it must render a not guilty verdict if it finds that Defendant was an accessory after the fact. *213 Rather, Defendant alleges that the court should have read to the jury the definition of accessory after the fact, per La. R.S. 14:25.[23] The record reflects that Defendant failed to make an objection to the jury charge. Accordingly, he has waived this claim. Unless objected to contemporaneously, an irregularity or error in the charge to the jury may not be asserted on appeal. La. C. Cr. P. art. 841; State v. Belgard, 410 So.2d 720 (La.1982); State v. Wilson, 28,403 (La.App. 2d Cir.8/21/96), 679 So.2d 963. Further, Defendant was not charged as an accessory after the fact, nor is that offense a responsive verdict to a charge of armed robbery. La. C. Cr. P. art. 814(A)(22). See, e.g., State v. Dotson, XXXX-XXXX (La.App. 3d Cir.3/2/05), 896 So.2d 310; see also State v. Hebert, 29,062 (La.App. 2d Cir.1/22/97), 688 So.2d 612.

CONCLUSION
For the reasons set forth herein, the convictions and sentences of Defendant, Tony Lavelle Hunter, are affirmed.
AFFIRMED.
NOTES
[1] The Tanglewood Heights subdivision has been described as a "very high crime area" by the Monroe Police Department.
[2] Harold was convicted in 1999 of conspiracy to possess drugs at this home.
[3] She estimated the time was 10:30 p.m. to 10:45 p.m.
[4] On an unspecified date after the crime, Emma was working at a local gas station when she looked out the window and saw Defendant sitting in a red F-150 similar to the one she saw on the night of the murders. She said he stared back at her, but then drove away when a police car came in the parking lot.
[5] It was later learned that a Ouachita Parish Sheriff's Office ("OPSO") deputy had stopped Defendant, driving a red Ford F-150, for a traffic violation in the Tanglewood Heights subdivision on March 7, 2001.
[6] Chavez was Henry's brother and Jeremy was Henry's cousin. The boys often spent the weekend at Anthony's Greenwood Drive home.
[7] The coroner later determined that both of the children had been shot twice. Each boy was shot once in the head; and, additionally, Jeremy had a gunshot wound in his right wrist and Chavez had a gunshot wound to the chest. Chico had been shot several times. Three of his wounds were head wounds from a .22. From the soot on Chico's head, the coroner concluded that the muzzle of the gun was probably held less than an inch from his head at the time of firing. The coroner recovered three .22-caliber bullets from inside Chico's head. Chico had several other gunshot wounds; the coroner recovered a .45-caliber bullet from his chest. It was further determined that this bullet was not fired from Harold's pistol.
[8] The markings on the other two shells proved inconclusive.
[9] On March 17, 2001, a Monroe police officer, working an unrelated traffic accident, found a Smith & Wesson Model 422 .22 pistol on the median of Highway 165 in Monroe. Forensic testing showed that the four spent cartridge cases found at the Greenwood Drive murder scene were fired from this gun. It was determined that three of the five live .22 cartridges found at the scene had been cycled through this gun. No fingerprints were recovered from the .22. The .45-caliber weapon used in the offense was never recovered.
[10] The truck was examined by OPSO investigators and DNA analysis was run on various material samples and items of clothing taken from the truck. DNA analysis was also run on some clothing taken from an apartment where Defendant stayed. The analysis did not, however, link any of the sampled materials to the victims, and no scientific evidence (fingerprints, tire tracks, footprints, hair, fiber) linked Defendant to the 221 Greenwood Drive crime scene. The truck's headlights were not malfunctioning when it was recovered.
[11] See No. 38,695-KW.
[12] Comanche was convicted of aggravated battery and possession of a firearm by a convicted felon and sentenced to five years probation for the aggravated battery and to consecutive ten-year prison terms for the firearm conviction.
[13] Nelson did not testify. He informed the court through counsel that he would invoke his Fifth Amendment privilege should he be called to testify.
[14] Comanche admitted that he had previously told a defense investigator that he had heard that the murder weapon was in Texas. The jury further heard evidence that Comanche may have changed his story regarding the time and location of the above-described conversation(s).
[15] Wiggins originally refused to testify when he was called; however, he later agreed to testify after meeting with a representative from the Ouachita District Attorney's office. Wiggins was convicted of manslaughter, simple robbery, simple burglary, attempted simple burglary and forgery. He was at OCC serving a ten-year sentence for forgery. Wiggins was subject to a habitual offender proceeding, but no such proceeding had been filed against him.
[16] In an earlier statement, Wiggins said that Defendant told him that the occupant of the house let him inside. Wiggins also said that he had previously told investigators that Defendant claimed to have used a .38-caliber and 9-millimeter weapon to commit the crime. He stated that Defendant shot Williams on the couch of the house. Further, Wiggins initially denied to a defense investigator that Defendant had talked about any activity in which he had been involved.
[17] Kennedy was convicted of first-degree robbery and sentenced to serve twenty-five years in prison, at hard labor, twenty years of which were suspended. He was also convicted of possession of cocaine, unauthorized entry of a place of business, receiving stolen things, unauthorized use of a moveable and misdemeanor illegal possession of stolen property.
[18] The murder charge was ultimately predicated only on specific intent and not on felony murder to avoid double jeopardy problems.
[19] At that hearing, OPSO investigator David Harris testified that a person claiming to be Defendant called him after the homicides but before Defendant's arrest and offered to come in, talk about the investigation and take a lie detector test. He stated that the person did not mention DNA during the conversation, although he did offer to do "anything." Investigator Harris rejected this offer and did not offer to speak further with Defendant.

At trial, the defense attorney told the jury during his opening statement about this alleged offer by Defendant, and that Defendant had offered to take a lie detector test or give a DNA sample. In response, the State made a motion in limine asking the court to prevent Defendant from referring to this conversation as it was hearsay. After calling Investigator Harris to testify outside the presence of the jury about the conversation, the court sustained the motion and ruled that Investigator Harris could not testify about the conversation; this court denied Defendant's emergency writ.
[20] The connotation of the word "Trigger" is also not so inherently damaging as to render the references impermissibly prejudicial. The nickname "Gunslinger" in the Edwards, supra, case directly refers to the use of firearms and has a reckless connotation; "Trigger" may refer to firearms, but also is, as noted by the State, the name of Roy Rogers' famous horse.
[21] The above is akin to the "law of the case" doctrine which was explained in Robideau v. Johnson, 31,770 (La.App. 2d Cir.3/31/99), 731 So.2d 955, writ denied, 99-1564 (La.9/17/99), 747 So.2d 562:

The "law of the case" principle is a discretionary guide which relates to (a) the binding force of a trial judge's ruling during the later stages of trial; (b) the conclusive effects of appellate rulings at trial on remand; and (c) the rule that an appellate court ordinarily will not reconsider its own rulings of law on a subsequent appeal in the same case. Reargument in the same case of a previously decided point will be barred where there is simply a doubt as to the correctness of the earlier ruling. However, the law of the case principle is not applied in cases of palpable error or where, if the law of the case were applied, manifest injustice would occur....
The law of the case applies to parties who were parties when the former decision was rendered and who thus had their day in court. Reasons for this doctrine include: to avoid relitigation of the same issue; to promote consistency of result in the same litigation; and to promote efficiency and fairness to both parties by affording a single opportunity for the argument and decision of the matter at issue....
When an appellate court merely denies a writ of review, only declining to exercise its extraordinary powers of supervisory jurisdiction, reconsideration of an issue is not barred in an appeal from the final judgment.... (Citations omitted.)
See also State v. Davis, 03-488 (La.App. 5th Cir.11/12/03), 861 So.2d 638, writ denied, 03-3401 (La.4/2/04), 869 So.2d 874; State v. Gillet, 99-2474 (La.App. 4th Cir.5/10/00), 763 So.2d 725.
[22] Further, the results of a lie detector test are inadmissible in Louisiana when offered by either party, either as substantive evidence or as relating to the credibility of a party or witness. State v. Legrand, 02-1462 (La.12/3/03), 864 So.2d 89, cert. denied, ___ U.S. ___, 125 S.Ct. 1692, 161 L.Ed.2d 523 (2005); State v. Robertson, XXXX-XXXX (La.3/4/98), 712 So.2d 8, cert. denied, 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998).
[23] This statute provides:

An accessory after the fact is any person who, after the commission of a felony, shall harbor, conceal, or aid the offender, knowing or having reasonable ground to believe that he has committed the felony, and with the intent that he may avoid or escape from arrest, trial, conviction, or punishment.
An accessory after the fact may be tried and punished, notwithstanding the fact that the principal felon may not have been arrested, tried, convicted, or amenable to justice.
Whoever becomes an accessory after the fact shall be fined not more than five hundred dollars, or imprisoned, with or without hard labor, for not more than five years, or both; provided that in no case shall his punishment be greater than one-half of the maximum provided by law for a principal offender.