# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 18-752

STATE OF LOUISIANA

VERSUS

JOSHUA D. SANT

**********

APPEAL FROM THE
TWENTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF LASALLE, NO. 16-840
HONORABLE J. CHRISTOPHER PETERS, DISTRICT JUDGE

**********

**D. KENT SAVOIE**
**JUDGE**

**********

Court composed of Elizabeth A. Pickett, D. Kent Savoie, and Jonathan W. Perry, Judges.

**AFFIRMED.**

**J. Reed Walters**
**District Attorney**
**28th Judicial District Court**
**Post Office Box 1940**
**Jena, Louisiana 71342**
**(318) 992-8282**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**Post Office Box 2125**
**Lafayette, Louisiana 70502**
**(225) 806-2930**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Joshua D. Sant**

**SAVOIE, Judge.**

On June 22, 2016, Defendant, Joshua D. Sant, was charged by bill of indictment with one count of second degree murder, in violation of La.R.S. 14:30.1; one count of conspiracy to commit second degree murder, in violation of La.R.S. 14:26 and 14:30.1; and one count of hate crimes, in violation of La.R.S. 14:107.2. On April 23, 2018, Defendant proceeded to trial on the second degree murder and conspiracy to commit second degree murder charges. On April 25, 2018, a unanimous jury found Defendant guilty as charged on both counts.

On June 12, 2018, Defendant was sentenced to mandatory life imprisonment at hard labor for the murder of Chelsey Copling. In addition, he was sentenced to mandatory thirty years at hard labor for conspiracy to commit said murder with the sentences to run consecutively to each other. Defendant also received an additional thirty days for contempt of court after telling the trial court "y'all can go get fucked for all I care man."

On July 2, 2018, Defendant filed a pro se "Motion for Reconsideration of Sentence," asking the trial court for a lesser sentence based on his status as a first offender and being sole provider for his family. On July 10, 2018, counsel filed a "Motion to Reconsider Sentence" on Defendant's behalf, alleging that running Defendant's sentences consecutively is excessive and requesting they be run concurrently as they arise out of a single course of action. During a hearing on the two motions on August 7, 2018, Defendant abandoned his pro se motion and joined in counsel's motion. The trial court denied the motion for reconsideration.

Defendant now appeals his convictions and sentences, alleging insufficient evidence to support his convictions and arguing that the trial court's decision to run

his sentences consecutively is excessive because they arose out of a single course of action.

## DISCUSSION

During the testimony of Detective Tracy Clark of the LaSalle Parish Sheriff's Office, the State introduced Defendant's April 26, 2016 videotaped confession to Detective Clark and Chief Deputy Jimmy Arbogast, as well as a transcript of said confession, as State's Exhibits 4 and 5, respectively.

*APRIL 26, 2016 CONFESSION*

After being informed of his *Miranda* rights, Defendant agreed to talk with Detective Clark and Deputy Arbogast about the day two people, Demond Carter and Chelsey Copling, went missing. Defendant stated that he went to Thomas Aubrey's house to eat some shrimp for Chelsey's birthday. He said he did not know Chelsey or Demond very well but he knew "you call him D and her Chelsey." Defendant said the couple complained about not having fun since they had arrived in the area, so Defendant invited them to come to his house to "play some beer pong and some Uno." He stated that Austin Dyess, his co-defendant, was at his house along with a few other people named Rose, Nathan, and Defendant's uncle, Bobby Sant.

According to Defendant, Demond told him they left Texas to get clean and get away from dope, but then Chelsey started trying to smoke marijuana, which Defendant took away and gave back to Demond. Around 11:15 p.m., Defendant stated that they decided to head home and that Defendant was going to give them a

2

ride because they were drunk. Defendant also stated that his wife,[1] Katy, stayed inside because she did not really like the couple. Defendant claimed that Austin informed him Chelsey had thrown her purse in Defendant's truck and then they left the house on foot. Defendant stated he looked for the couple, but he could not find them. Defendant acknowledged he was a little drunk as they had consumed "a thirty pack [of beer] and another case," as well as some whiskey.

Defendant stated he had brought his Uncle Bobby to Defendant's parents' home in Winn Parish earlier in the day but stated he did not go to their house the night of the shootings. He claimed to have no idea about what had happened to the couple after they left his home. When Detective Clark asked Defendant why he had buried a plastic box in his back yard, Defendant stated he gave the box, which contained bullets and shell casings, to Austin a few weeks prior, and Austin buried it in his back yard because he "got scared of everything that's going on."

At that point, Detective Clark told Defendant:

> Did you see those stars as I was putting them? Nope, nope, nope, nope, nope. Those things I can prove wrong. So listen to me, listen to me. Before you get mad and aggravated and you're looking at me like that, ok, just know that I already know a lot of stuff, ok. We had to double bag those bodies, because they stunk, and they're falling to pieces. Ok, it's pretty sad, but that's what we had to do today. When you called me on the phone, I was looking for them, and I found them, ok. But I hadn't found them yet, when I talked to you on the phone. I still wanted to talk to you, because I didn't know if they were alive, or dead. They put you in handcuffs when you drove up, because at that point, I knew they were dead.

Defendant then told Detective Clark the following story, placing all of the blame on Austin Dyess:

---

[1] It should be noted that the record subsequently makes it clear that, while Defendant refers to her as his wife, he and Katy were never married. Katy was pregnant with Defendant's son at the time of the shootings.

Ok. We rode down to the pond about 10:30, 11:00 and we got out and we was [sic] looking around because they hadn't been to no pond or anything around here. Him and Austin got into an argument and the next thing I know, he used my 44 that was laying in the seat, and shot both of them. And it scared me, it's [sic] really scared me. And I . . . I don't want to loose [sic] my family over this and that's why I tried to be quiet because I don't know what's going on and I don't know what he is capable of. And I'm telling you the truth.

Defendant then stated that Austin threw the 44 into the pond where the bodies had been dumped. When asked where the second gun was, Defendant stated, "If there's two guns, I don't know about two guns. I had two pistols in the truck." He subsequently stated "I didn't kill them, I didn't kill nobody. You can put me on a lie detector test." He stated he kept a 44, a 22 Taurus, and a 12-gauge shotgun in his truck at all times but noted only the 12-gauge was currently in the vehicle. Defendant again claimed Austin threw the guns in the water. Claiming he never left the vehicle, Defendant told Detective Clark the following version of what happened between Austin and the couple:

I know he had one [gun] in one hand. I know that for a fact, and then they started arguing and I heard two shots, then I heard three. And I told him I said let's get out of here, please. And I went to the house and I called Thomas.

Defendant told Detective Clark that after Austin killed the couple, he threw their bodies into the pond on his own, then came back to the truck, and they left. After some discussion of Defendant's story not matching up with what Detective Clark already knew, Defendant gave the following version of what happened at the pond:

Well I want to tell you the truth 100%. I always have my 22 in my pocket at all times and I guess he got that 44 out of the truck for some stupid reason, I don't know. We went over there and we was looking around and him and that boy got in an argument and that boy had actually taken, started trying to take the pistol away from Austing [sic] and all I seen was Austin getting shot by somebody that he doesn't know, and I shot him.

4

Defendant claimed Austin then shot the girl, and they threw the pistols in the water before leaving. Defendant again stated that he shot Demond with the 22 and that Austin shot Chelsey in the head with the 44. Defendant claimed he yelled at Demond multiple times to let go of Austin when they were struggling, claiming "I was just trying to scare him at first and then it turned into something more." Defendant stated "I did what I had to do. And we was gonna leave and Austin shot her, why I don't know why he would do that."

Defendant admitted that his Uncle Bobby was never at his house on the night of the shooting and that he asked Nathan and Rose Palmer to tell law enforcement they were at the house to boost his alibi. Defendant then acknowledged that Austin was the one with the 22 who shot Demond and that he helped Austin throw the bodies in the pond. Defendant stated he had the 44 in the back of his pants when they got out of the truck and claimed he did not know Austin had the 22, which was on the front seat of the truck. Defendant maintained that Austin and Demond got into a drunken argument, Austin pulled the 22 and Demond tried to take it from him, at which point Austin shot Demond. Then Defendant claimed "I fucked up, she come [sic] running and screaming and I didn't know what else to do," noting that "I killed her and I regret it everyday." Defendant then stated after Austin shot Demond two more times that they threw the bodies and guns in the water then left. Defendant later claimed that he is in trouble "[b]ecause somebody was stupid, and I panicked." He also stated "I let a fucking retard get me in trouble, I'm loosing [sic] everything that I've worked so hard for."

Detective Clark testified that when Defendant was booked into the jail on April 29, 2016, they still had not located the murder weapons, despite help from

dive teams from the Rapides Parish Sheriff's Office and the United States Marshal's Office. The State then played a video of Defendant being booked into jail, during which Defendant admitted the guns were never thrown into the pond but that he had brought the guns to his father, who was still in possession of them. Defendant's parents agreed to bring the weapons to law enforcement.

Defendant took the stand at trial and testified that he and Katy went to Mr. Thomas' house to boil shrimp for Chelsey's birthday, noting they met Chelsey and Demond for the first time that day. He testified they spent most of the day at Mr. Thomas' house, with Defendant, Chelsey, Demond, and Katy leaving around dark when Mr. Thomas got into an argument with his wife. Defendant testified that he and Katy began playing beer pong against Chelsey and Demond once they got home, until Austin arrived and took Katy's spot. He stated Katy had separated herself from the others and was ignoring everyone. Once they began running low on alcohol, Defendant testified that they went inside to put on shoes and a shirt and grabbed a rifle and shotgun from inside the house so that all five of them could go to "the oilfield to go shoot some cans and ride around." Defendant testified that "the only disagreement that come [sic] up that night, it was them smoking Mojo. And I told them we do not smoke drugs at the house."

Defendant testified that once they reached the pond, Demond and Chelsey were getting the cans for targets from the truck, Katy and Austin got the pistols out of the truck, and Defendant was looking for shells for his shotgun when he heard a gunshot followed ten or fifteen seconds later by two more gunshots, then screaming. He testified Austin was screaming at Chelsey to shut up, Chelsey wanted to be released, then Austin pushed Chelsey down and shot her twice. Defendant testified he and Austin had a conversation which resulted in Defendant

6

fearing for his life, so he helped Austin dump the bodies in the water. He testified he took the pistols to his parents' house because he "had the intentions [sic] of giving them to the police."

After dumping the guns with his parents, Defendant testified that he, Katy, and Austin returned to his house and had a conversation in the kitchen, which left him in fear for the safety of himself and his family. He testified that the following morning he informed an unknown police officer that Chelsey and Demond were missing, not telling him what happened out of fear. Defendant stated that Austin and Katy were sitting outside when he got home that day and that they had a conversation that made him feel "that [his] son's life was in danger and [he] felt that [his] mother and father's life was [sic] in danger."

The next day, Tuesday, Defendant testified that after work he, Katy, and Austin were across the street from the house helping a neighbor work on his truck when he and Austin were picked up and gave their initial statements to police. Defendant testified that he lied to police because he did not "feel like the police could have protected [him] or [his] family."

On cross-examination, the State introduced a letter Defendant had previously sent to Katy, telling her a new story about "what really happened" at the pond; the State had Defendant read the letter aloud. The story in the letter was that he, Austin, Chelsey, and Demond were getting ready to leave the pond when Austin said something to Demond, pulled out a gun, and shot Demond when he tried to take the gun. Defendant was standing between Austin and Chelsey when Austin shoved him to the ground, tried to kill Chelsey but the gun jammed, so he pulled out the second gun and murdered her before threatening Katy and Defendant's unborn son while holding a gun to Defendant's head. Defendant then

claimed he was scared of Austin because "[h]e said he was some kind of nations and [had] brothers everywhere."

Defendant continued to stick to his story that he lied to the police multiple times because he was scared of Austin Dyess. Defendant claimed that he confessed to murder because it was what Detective Clark wanted to hear. He also testified that he never mailed the letter to Katy, although he claimed she requested that he write the letter.

**ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent present.

**ASSIGNMENT OF ERROR NUMBER ONE**

In his first assignment of error, Defendant contends that there was insufficient evidence to support his convictions for second degree murder and conspiracy to commit second degree murder.

The analysis for a sufficiency claim is well settled:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

8

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

<u>SECOND DEGREE MURDER</u>

Under La.R.S. 14:30.1, second degree murder is relevantly defined as the killing of a human being "when the offender has a specific intent to kill or to inflict great bodily harm." As the fourth circuit recently noted in *State v. White*, 14-397, p. 17 (La.App. 4 Cir. 7/29/15), 174 So.3d 177, 189, *writ denied*, 15-1577 (La. 10/10/16), 207 So.3d 408, "to prove second degree murder the state must prove the killing of a human being either with specific intent or when the offender is engaged in one of the listed crimes."

Defendant's argument that there was insufficient evidence to convict him of second degree murder can be summed up by his claim that he "testified at trial that he did not shoot either of the two victims. No other witness testified from personal knowledge that Joshua shot either victim." Although Defendant argues that the State relied solely on circumstantial evidence, the argument is factually inaccurate. Although "no other witness testified from personal knowledge" that Defendant killed Chelsey Copling, the State did produce direct evidence that Defendant shot Chelsey, namely, State's Exhibit 8, Defendant's confession. Defendant's conviction rests on the jury's determination that Defendant was telling the truth when he confessed to murdering Chelsey Copling rather than when he took the stand and claimed Austin Dyess used two separate guns, both of which belonged to Defendant, to murder both Demond and Chelsey.

As this court has previously noted with regard to an eyewitness who gave different statements at different times:

> Clearly, the jury was made aware of the witness's lies but still found him credible regarding the offense. As the jurisprudence makes clear,

> a jury's credibility assessment is not to be second-guessed on appeal. This court has only a cold record to analyze, while the jury was able to view the witness's demeanor and hear the inflections in his voice.

*State v. Kato*, 12-1356, p. 6 (La.App. 3 Cir. 5/15/13), 157 So.3d 695, 700.

Although *Kato* involved a co-defendant whose story changed at trial, the principle is the same for Defendant. It was made clear that Defendant had lied about what happened on the night of the shooting. The jury heard multiple versions of what happened through the introduction of Defendant's prior statements, then heard a new version at trial which, unlike every prior version, placed the mother of Defendant's only child at the scene. As noted by the second circuit in *State v. Hunter*, 39,664, p. 13 (La.App. 2 Cir. 6/29/05), 907 So.2d 200, 209, *writ denied*, 05-2027 (La. 3/10/06), 925 So.2d 507, "A reviewing court accords great deference to a judge's or jury's decision to accept or reject the testimony of a witness in whole or in part." Finally, "[c]onfessions, unlike mere admissions, are direct evidence of guilt." *Id.* The jury, in returning a unanimous guilty verdict, clearly believed Defendant's confession on April 26, 2016, not his trial testimony.

Based on the foregoing, the evidence, when viewed in the light most favorable to the prosecution, supports Defendant's conviction for second degree murder.

## *CONSPIRACY TO COMMIT MURDER*

Defendant, while acknowledging in a footnote that Austin Dyess made a statement that Defendant had intended to kill the couple because of racism before they left the house, argues "there was no evidence that prior to either person being shot, [Defendant] and Mr. Dyess had an agreement between themselves to kill the victims."

The elements of the crime of conspiracy are (1) an agreement or combination of two or more persons for the specific purpose of committing a crime, and (2) an act done in furtherance of the object of the agreement or combination. La.R.S. 14:26. An essential element of the crime of conspiracy is specific intent. *State v. Guillory,* 540 So.2d 1212, 1215 (La.App. 3 Cir.1989). Specific intent is defined as that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La.R.S. 14:10(1). Even though intent is a question of fact, it may be inferred from the circumstances of the transaction and the actions of the defendant. La.R.S. 15:445; *Guillory,* 540 So.2d at 1215. The existence of specific intent is an ultimate legal conclusion to be resolved by the trier of fact. *Guillory,* 540 So.2d at 1215; *State v. Graham,* 420 So.2d 1126 (La.1982).

*State v. Valrie*, 99-226, p. 5 (La.App. 3 Cir. 10/13/99), 749 So.2d 11, 14-15, *writ denied*, 99-3236 (La. 4/20/00), 760 So.2d 343.

Defendant's argument is that no evidence was presented to show that there was an agreement between Defendant and Austin to kill Chelsey prior to her death. However, the State counters that Defendant "is placing total reliance on the term 'agreement' in his argument to show that the elements of the crime of conspiracy have not been proven." Citing *Valrie*, the State focuses on the fact that "conspiracy may be completed by a combination of 2 or more persons along with the overt act." The State argues that the evidence clearly showed a conspiracy to commit the murder, noting Defendant and Austin Dyess together took the couple out to a remote location, both armed themselves with Defendant's guns, they put the bodies in the pond together after the shootings, and they then brought the weapons to Defendant's parents.

In *Valrie*, this court stated:

After reviewing the record, we conclude that a rational trier of fact could have inferred that the Defendant entered into an agreement with Counts to commit an armed robbery. The Defendant waited in a getaway car and then drove that vehicle so as to avoid capture. The Defendant's fingerprint was found on the magazine of the gun used in

11

the robbery, which gun was then recovered from the wrecked vehicle driven by the Defendant. The actions of the Defendant during and after the armed robbery were sufficient to enable the trier of fact to infer the specific intent necessary to prove a conspiracy.

*Id*. at 15.

*Valrie* did not include a discussion of any verbal agreement between the parties to commit the bank robbery in question. Furthermore, in *State v. Brown*, 398 So.2d 1381, 1386 (La.1981), the supreme court stated:

> These facts, circumstances and inferences from them, if unexplained, would establish that this defendant was told to commit the crime and acted upon this communication by taking the gun from Williams, sticking it out the window of the car, pointing it at the officer, and unsuccessfully attempting to fire it, and then firing it. The recited facts which were found in the testimony of defendant and the testimony of Gauthier provide a prima facie case that defendant and Tommy Williams by their words and actions agreed and combined to shoot the officer.

A rational finder of fact, when viewing the evidence presented at trial in the light most favorable to the prosecution, could have found Defendant guilty beyond a reasonable doubt of conspiracy to commit second degree murder. As noted above, both Defendant and Austin Dyess took the couple into a remote area of the woods, both men were armed with weapons belonging to Defendant, and both Austin and Defendant worked together to dump the bodies and hide the murder weapons. Accordingly, Defendant's argument regarding sufficiency of the evidence lacks merit and his convictions are affirmed.

## ASSIGNMENT OF ERROR NUMBER TWO

In his second assignment of error, Defendant contends that the trial court's decision to run his sentences consecutively is excessive. Defendant does not contest the length of either sentence, simply the consecutive nature of their

12

imposition. Louisiana Code of Criminal Procedure Article 881.1 provides the

mechanism for preserving the review of a sentence on appeal:

> A. (1) In felony cases, within thirty days following the imposition of sentence or within such longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.
>
> . . . .
>
> E. Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.

Louisiana courts have laid out the following guidelines with regard to

excessive sentence review:

> Sentences within the statutory sentencing range can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762 (La.1979). In *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La.2/1/02), 808 So.2d 331, a panel of this court discussed the review of excessive sentence claims, stating:
>
>> La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

Further, in reviewing the defendant's sentences, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183. In *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061, a panel of this court observed that:

> While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, 958.

*State v. Soileau*, 13-770, 13-771, pp. 4-5 (La.App. 3 Cir. 2/12/14), 153 So.3d 1002, 1005-06, *writ denied*, 14-452 (La. 9/26/14), 149 So.3d 261.

As noted above, both Defendant and his counsel filed motions to reconsider sentence in the trial court. A hearing was held on August 7, 2018, at which time Defendant abandoned his motion and joined in counsel's motion, which urged that the consecutive nature of Defendant's sentences made them excessive. Defense counsel cited La.Code Crim.P. art. 883 for the premise that sentences for crimes arising out of a single transaction or occurrence should be concurrent and also urged the court to consider Defendant's status as a first felony offender and his steady work history. The trial court subsequently denied the motion.

As previously stated, "The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion." *Soileau*, 153 So.3d at 1005. The penalty for second degree murder where the offender is not a juvenile is life without benefit of probation, parole, or suspension of sentence under La.R.S.

14

14:30.1. Likewise, the penalty for conspiracy to commit second degree murder is imprisonment at hard labor for not more than thirty years under La.R.S. 14:26(C). Although Defendant is correct that La.Code Crim.P. art. 883 suggests sentences for crimes arising out of one act or transaction should be concurrent, it contains the following caveat: "[U]nless the court expressly directs that some or all be served consecutively." As this court noted in *State v. Richardson*, 16-107, p. 30 (La.App. 3 Cir. 12/28/16), 210 So.3d 340, 360, "It is, however, within the trial court's discretion to impose consecutive sentences provided that the trial court articulates particular justification for doing so at sentencing."

At sentencing, the trial court stated "this case was one of the most disturbing cases that [it had] ever presided over[.]" Noting Ms. Copling lost her life unnecessarily, the trial court found Defendant "never even gave the victims the decency of owning up to [his] actions." Furthermore, the trial court expressed its belief that Defendant orchestrated the entire evening's events. Finally, there is no practical difference between running Defendant's sentences concurrently or consecutively. Defendant's thirty year sentence for conspiracy is consecutive to his mandatory life sentence, which he has not contested. As this court noted in *State v. Dennard*, 482 So.2d 1067, 1068 (La.App. 3 Cir. 1986), "Since [Defendant] has but one life to serve, it is difficult to see that a consecutive sentence would penalize him excessively." Therefore, we find that the trial court did not abuse its discretion in running Defendant's sentences consecutively.

**DECREE**

Defendant's convictions and sentences are affirmed.

**AFFIRMED.**

15