# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 22-604


**STATE OF LOUISIANA**

**VERSUS**

**TRISTEN J. LAMONS**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. CR-2021-658
HONORABLE C. KERRY ANDERSON, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## CANDYCE G. PERRET
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Candyce G. Perret, Charles G. Fitzgerald, and Guy E. Bradberry, Judges.


**AFFIRMED. REMANDED WITH INSTRUCTIONS.**

**James R. Lestage**
**District Attorney**
**Post Office Box 99**
**DeRidder, LA  70634-0099**
**(337) 463-5578**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**Annette Roach**
**Louisiana Appellate Project**
**Post Office Box 6547**
**Lake Charles, LA  70606-6547**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Tristen J. Lamons**

**PERRET, Judge.**

Defendant-appellant, Tristen J. Lamons, appeals the trial court's ruling denying his motion to suppress evidence. He also contends the trial court erred in ordering a $1,000.00 fine be paid as a condition of parole. For the reasons that follow, we affirm the denial of defendant's motion to suppress. Further, because it is unclear whether the trial court intended to impose the payment of the fine as a condition of parole, we remand with instructions to impose a sentence in conformity with the plea agreement and to clarify that the fine is not to be made a condition of parole.

**PROCEDURAL HISTORY:**

On June 29, 2021, the State filed a bill of information charging Defendant, with possession of over twenty-eight grams of Schedule II Controlled Dangerous Substance with Intent to Distribute, Methamphetamine, in violation of La.R.S 40:967(A)(1) and (B)(1)(b). The State also charged Defendant with introduction of contraband into the parish jail by being in possession of methamphetamine and marijuana, in violation of La.R.S. 14:402(A) and (D).

On February 9, 2022, a motion to suppress was filed on behalf of Defendant. An amended motion to suppress was filed on May 31, 2022. A hearing on the motions was held on June 2, 2022, and June 10, 2022. Following the hearing, the trial court denied the motion to suppress.

On June 13, 2022, Defendant pled guilty to possession with intent to distribute methamphetamine but reserved the right to seek appellate review of the denial of the motion to suppress pursuant to *State v. Crosby*, 338 So.2d 584 (La.1976). As part of the plea agreement, the State dismissed the remaining charges including other misdemeanor charges under a separate docket number.

The parties agreed to a sentence of fifteen years at hard labor to run consecutively to all other sentences and a fine of one thousand dollars. The State further agreed to waive its right to file a habitual offender bill in consideration of the guilty plea.

Defendant now appeals this judgment, asserting the following two assignments of error: (1) the trial court erred in denying his motion to suppress and first amending motion to suppress; and (2) the trial court improperly ordered that one thousand dollars be paid as a condition of parole.

**TESTIMONY:**

At the hearing on Defendants motion to suppress, the State called Officer Tracy Crouch. Crouch testified that he received a dispatch call on May 6, 2021, in reference to a physical altercation between Alanna Stinson, a caregiver of Defendant's mother, and Defendant at a residence in DeRidder, Louisiana. Crouch said the information he received from dispatch indicated Defendant had left the residence in a white pickup truck; however, when Crouch arrived at the residence, he observed the white truck parked in the driveway. Crouch testified that he made contact with Stinson in the driveway, and she told him she had arrived at the house for shift work, and while there, she became involved in a verbal and physical altercation with Defendant. Crouch said Stinson told him there was a verbal altercation which increased to a physical altercation when Defendant grabbed her. Crouch stated he recalled Stinson telling him Defendant grabbed her around her neck or her throat and punched her on the side of the head. Crouch further stated Stinson told him she was fighting back and trying to get away. Crouch said while he was speaking with Stinson outside, he continued to hear yelling and screaming from inside the house. Crouch said he recognized Defendant's voice because he had previous contact with Defendant. Crouch testified Defendant then presented

himself at the doorway, but when Defendant saw the officer, he turned around and went back into the house.

Crouch testified that he attempted to talk to Defendant and entered the residence along with Officer Recia Guillory. Crouch stated Defendant was yelling, emotional, irate, kept carrying on, and did not completely cooperate with the officers. Crouch said he detained Defendant by placing him in handcuffs, and Defendant "was passively resistive but he wasn't completely uncooperative at that time[.]" Crouch stated he removed Defendant from the residence and escorted him to the patrol unit where Defendant was secured. Crouch said after securing Defendant, he continued to speak with Stinson as well as Defendant's parents. Crouch testified that Defendant's mother asked the officers to rescind the trespass order she had placed "a day or so before." Crouch stated Defendant's mother had previously asked that Defendant be barred from the residence, but she now wished to withdraw it.

Crouch testified that in speaking with everyone and based on the totality of the circumstances, the officers believed a simple battery had occurred, so they placed Defendant under arrest. Crouch confirmed he informed Defendant of his rights, and then Defendant was transported to the police station for booking. Crouch stated he believed he saw marks around Stinson's neck that further confirmed his suspicions that a battery had occurred. Crouch said he brought Defendant to jail on the simple battery charge, but after dropping Defendant off, jail personnel contacted him and said they found narcotics on Defendant's person. Crouch testified that another officer went back to the jail to recover the narcotics, and when Crouch went to observe the narcotics, he noticed a clear plastic bag

3

containing marijuana. Crouch confirmed the incident was recorded by his body camera.

Crouch testified that when he transported Defendant to the jail in the patrol unit, he saw Defendant reaching into his pants and discarding something onto the floor of the vehicle, which turned out to be marijuana. Crouch stated that he spoke with Defendant's parents and that his mother was not completely coherent as she recently had major surgery.

On cross-examination, Crouch said when he received notice that narcotics were located on Defendant's person at the jail, he believed there could be something inside the patrol unit. Crouch said he then found narcotics in the vehicle. Also, Crouch confirmed he made contact with the victim in the driveway, and the victim indicated the events occurred inside the house. Crouch stated he did not believe any of the events took place outside nor did he take any pictures of the marks on the victim's neck. Crouch confirmed that he initially arrived on the scene alone, but Officer Guillory arrived soon after. Crouch stated he did not return to the residence once he transported Defendant to the jail, but he said Officer Guillory and Officer Pruett may have remained at the residence.

Crouch said Stinson did not have any other outward signs that she had been hit, but he took Stinson at her word. Crouch testified that he entered the home after speaking with Stinson, and upon entering, he saw items on the kitchen table in disarray and food that had been spilled or thrown. Crouch said he overheard Defendant screaming from inside the house which caught his attention, but he did not hear any screams for assistance. Crouch said he observed Defendant and his parents in the kitchen. Crouch also said Defendant's mother asked to rescind the trespass order. Crouch testified that he learned from dispatch that other officers

4

had responded to a previous incident with Defendant and his family where Defendant's mother claimed Defendant had been criminally trespassing and asked to have him barred.

Crouch stated he initially approached Defendant to determine what had taken place, but Defendant was extremely irate and screaming. Crouch testified that he took Defendant to the vehicle so Crouch could investigate and speak with Defendant's parents. Crouch confirmed he did not witness the alleged battery of Stinson. Crouch said he spoke with Defendant's parents, and Defendant's father said Defendant had been out of control. Crouch said he did not have an arrest warrant or a search warrant. Crouch confirmed Defendant was in the house the entire time and came to the door once but went back into the house. Crouch said it could have been possible for Defendant to flee the residence on foot, but he did not see that kind of activity. Crouch stated Defendant's mother admitted there was a physical altercation between Stinson and Defendant.

At this time, the defense played Crouch's bodycam footage from the incident. Crouch again stated he received a call about a disturbance at the residence and that is when he was informed about the trespass order signed by Defendant's mother. Crouch said he heard Stinson say she pushed Defendant first and that they were both fighting. Crouch testified that he believed Stinson and Defendant got into the fight before she picked up a knife. Crouch confirmed he told the other officers on the scene that he had dealings with Defendant before and that Defendant was "always yelling and always getting in the face[.]"

Crouch said they arrested Defendant because the officers felt Defendant went to Stinson first, grabbed her around the throat, and that Stinson pushed him away to create distance between them. As to shoving Defendant first, Crouch

5

stated, he believed Stinson acted in self-defense because Defendant was in her face, and she felt threatened and in fear. Crouch said he believed the knife came after Defendant physically grabbed her around the throat, so she grabbed the knife to make sure Defendant did not come after her further. As to Defendant's mother, Crouch said he did not believe she was in her right mind, but no one specifically told him she was on medication. As to detaining Defendant, Crouch testified that Defendant was still talking and carrying on so he removed Defendant to deescalate the scene.

Crouch confirmed Defendant did not commit any crimes in his presence, and he felt that Stinson was no longer in danger once Defendant was detained. Crouch said he searched his vehicle upon returning to the police station after dropping Defendant at the jail. Crouch stated the back seats are sealed plastic seats so any narcotics would have to be on the floor. Crouch said he passed the marijuana on to Guillory who was the narcotics detective. Crouch also testified that he filled out an affidavit for an arrest warrant.

On re-direct examination, Crouch confirmed he submitted an affidavit for an arrest warrant and presented it to the judge. Crouch confirmed no one else operated his vehicle and that he searched the patrol unit shortly after receiving the call that Defendant had narcotics on his person. Crouch said he found a clear bag of marijuana on the floor. Crouch stated that, after watching the footage, it appeared Defendant was pulling something out of his pants and dropping it on the floor.

The State then called Officer Robert Hunt. Hunt confirmed he was called to assist in a drug investigation involving Defendant. Hunt testified that he assisted in searching the home of Defendant's parents. Hunt stated he was informed by

6

Guillory of a battery call where narcotics had been located, so Hunt arrived at the scene to assist. Hunt stated he arrived after Defendant had been brought to the jail and drugs were found in Defendant's possession. Hunt stated he was present while the search warrant was being submitted and was also present when Defendant's parents signed the permission to search. At this time, the State introduced the permission to search form and an application for search warrant of the home and vehicle. As to the permission of the search and seizure form, Hunt said he was present at the home when it was signed, and it appeared to Hunt that both of Defendant's parents signed off on the permission to search. Hunt testified that the search warrant was applied for before the permission to search was signed, but in the process of waiting for the signed warrant, the parents were willing to sign a permission to search. Hunt stated there were no illegal narcotics found in the house, but drugs were found in the white truck in the yard. Hunt testified that a large Ziploc bag with a large quantity of a crystalline substance was found in the truck, and the substance was consistent with and appeared to be methamphetamine. Hunt confirmed the substance tested positive for methamphetamine. Hunt stated the officers also found a black digital weighing scale in the vehicle.

Hunt further confirmed that Detective Samuel Bailey's bodycam captured video of the officers conducting the search. Hunt stated that Defendant's parents did not initially give permission to search, so the officers proceeded with the application for a search warrant from their patrol unit. Hunt said Bailey was in the house with Defendant's parents while he and Guillory were prepping the application. Hunt stated they allowed the parents to stay in the home because of their age, so Bailey kept watch to be sure no destruction of evidence took place. Hunt again confirmed that he witnessed the parents sign the permission to search

7

both the home and vehicles as well as participated in the searches. Hunt testified Defendant's parents said Defendant commonly uses the truck.

On cross-examination, Hunt stated the officers stayed in the house for about three hours. Hunt said the officers had a right to be at the house because they were waiting for a search warrant that was ultimately signed by a judge. Hunt stated he took the pictures of the vehicle and narcotics after they had the permission to search form signed. Hunt said, despite the time the camera showed, he took the photographs after receiving consent to search.

On re-direct examination, Hunt testified that he took the photographs after receiving consent to search, and he did not see any other officer take photographs at an earlier time. Hunt stated that based on his training, he waits for permission to search or for a search warrant before taking photographs. Hunt testified that he did not recall Defendant's parents asking the officers to leave the residence.

On re-cross, Hunt said it was a mistake for him to not sign his name as the witness. Hunt confirmed he and the other officers were in and out of the house the whole time they were there.

The trial court then judicially noted that the search warrant document was created at 1:07 p.m., was submitted to the judge at 2:05 p.m., viewed by the judge at 5:43 p.m., and signed by the judge at 5:45 p.m. on May 6, 2021.

The defense then called Officer Dylan Hinton. Hinton confirmed he was present during the investigation of Defendant and was the last detective to arrive on the scene. Hinton said when he arrived, he was informed by the other officers that they were waiting for a search warrant to be approved. Hinton stated he waited about an hour and a half, but the search warrant did not come in while he was on the scene. Hinton said they received permission to search while on the scene, but

8

the search warrant was later approved in the warrant after they had departed. Hinton said they conducted the search based on the permission to search. Hinton testified that drugs were found inside the vehicle under the console.

On cross-examination, Hinton said he remembered being involved in searching the truck and finding a bag of what appeared to be methamphetamine.

When questioned by the court, Hinton said the officers did not search the vehicle until the permission to search was signed. Hinton stated he did not search anything prior to the signing of the permission to search form.

The defense then called Dorsina Lamons. Lamons confirmed Defendant is her son. Lamons stated she required surgery for her stroke and brain bleed in 2020. Lamons said Stinson had been assisting with her care for about a month. Lamons testified that, on one occasion, she had an issue with Defendant and wanted him out and barred from the house. Lamons said she then called Defendant back one day and invited him for breakfast. Lamons testified that Defendant and Stinson became involved in an altercation where Stinson had her hands up and pushed Defendant and Defendant called her "Lil' girl." Lamons confirmed both Defendant and Stinson pushed each other, and at this point, Stinson called her mother and the police.

Lamons said she was sitting down at the kitchen table when the police arrived. Lamons testified that the police turned the doorknob and walked right in and said they were there to pick up a trespasser. Lamons stated the police walked through the den and told Defendant to put his hands behind his back because he was under arrest. Lamons said Defendant was not trespassing, but Defendant was placed in handcuffs and taken outside. Lamons confirmed the police officers went to get a search warrant because the Lamons originally refused to sign the

9

permission to search. Lamons said the police stayed in and around her house for three or four hours. Lamons confirmed she signed the permission to search because she did not want the police staying in her house because the officers "made themselves extremely comfortable[.]"

Lamons said the officers searched the truck before the officers had the "search warrant or anything." Lamons said she yelled that the truck was in her name, and she wanted to know what the officers were looking for. Lamons said the officers were opening doors and pulling on the back seat. When asked whether the officers were searching before she signed the form, Lamons first stated, "I had already signed the permission to search . . . but they were out there already in the truck." When asked, "You're saying that before you signed the permission, they were out in the truck?" Lamons answered, "Yeah. They were out in that truck." Lamons confirmed she was taking about ten medications on the day of the incident.

On cross-examination, Lamons confirmed that she was taking medications which included Seroquel, a sleep aid, and oxycodone for pain. Lamons stated she had back surgery before her brain bleed and needed the medicine. Lamons confirmed she had taken some of the medicine on the day of trial. The court interjected and asked Lamons to clarify about the search of the truck. Lamons stated the officers looked in the truck before she signed the permission to search but did not fully search until after she had signed it. Lamons said as soon as the police came in without permission, "they start unbuckling their guns[.]" Lamons stated she did not see her son get in Stinson's face and only heard him say, "Lil' girl, I'm not interested in you. You not even my type."

Lamons confirmed that three days before this incident, she had called the police about trouble with her son and how she wanted the police to order Defendant to leave or consider him a trespasser. Lamons said she did not call the police and tell them she had changed her mind and to remove the trespass order.

The defense then called Robert Lamons (Robert) to the stand. Robert said he was home on the day of the incident. Robert said he saw the officer arresting Defendant and placing him in the patrol unit, but the officer would not answer why Defendant was under arrest. Robert stated he approached Stinson who said she pushed Defendant and Defendant pushed her, and she grabbed a knife. Robert confirmed he did not witness the altercation. Robert testified that the officers initially came inside the house and arrested Defendant; then the officers returned and asked if they could search the home. Robert said both he and his wife told the officers they could not search their home. Robert stated the police then informed him that they would get a warrant, but the police never came back and showed him the warrant. Robert confirmed that he refused the permission to search at least twice, but he agreed to sign the form because his wife was in pain and needed to take medication. Robert further confirmed that he is also on medication because he had a seizure and a stroke. Robert said the officers remained in the home for several hours, with some officers going in and out. Robert said after he signed the permission form, he did not see what the police officers did.

On cross-examination, Robert said he could not recall having any trouble with the caretaker in the past. Robert stated he did not see any of the officers going through anything while they were in the house with him. Robert testified that after he signed the form, he walked to the door and saw the officers in the truck. Robert confirmed that he did not ask the officers to leave while they were

waiting for a search warrant. During his testimony, Robert stated, "Right now I'm taking about 17 pills in the morning and 17 pills at night . . . . But before then, I was taking probably about 10 to 12 pills[.]" Robert said he had a stroke so "some of the things I may not remember completely."

On redirect examination, Robert said he did not see the altercation between Defendant and Stinson, but he saw a knife in Stinson's hand when she was outside.

Following the hearing, the trial court ruled as follows:

> So the question is: Which, if any, of those seizures of assets or items was illegal or unconstitutional?

> So we'll start from the first of those. The officers responded to a call of somebody of a crime being committed. The 911 recording said that there was an assault. When the officers responded, their also [sic] initial thought process was there was a trespass or entry on or remaining, whether [Defendant] was being forbidden, because three days prior they had been there and Mrs. Lamons and Mr. Lamons had both told the police, "We don't want [Defendant] back here. You tell him not to come back here. We don't want him here."

> So that's - - that was the mindset of the police officers, understandably so when they got there. It's all one hundred percent (100%) recorded on Officer Crouch's body cam as to what was said, who said, who was talked to, et cetera.

> He was outside talking to Ms. Stinson, [Defendant] can be overheard. I think Officer Crouch's words were yelling and screaming. In any event, you can hear something coming from the house from [Defendant] on that body cam.

> Then [Defendant] comes outside, Officer Crouch says something to the effect of, "Hey, I want to talk to you." [Defendant] immediately turns around and starts going back in the house. . . .

> . . . .

> . . . I think the law is clear, that under those circumstances for officer safety Officer Crouch could have opened a doorknob. But what I saw on the video is the door was never even fully shut. The door was sort of swung back towards the closing position. Officer Crouch stopped it and stops momentarily at the door asking [Defendant] to come talk to him.

12

It appears that Mrs. Lamons is seated at the breakfast table at that point in time. [Defendant] refuses; he's still being very frustrated in his conversation. Officer Crouch goes in to talk to him and detains him.

Now, I understand if you're in the person's position, that you're being handcuffed, that may feel more like an arrest than a detention, but I think the case law in today's world allows officers for officer safety, if someone has been reported to have committed an assault or a battery and they're very agitated that under those circumstances for officer safety, I think they're allowed to temporarily detain that person.

Officer Crouch says that several times on his video. "I'm not arresting [Defendant]; I'm detaining him."

Officer Crouch takes [Defendant] out, puts him in the vehicle, and then Officer Crouch very methodically talks to everybody at the residence. Lengthy conversations with Mrs. Dorsina Lamons, Mr. Robert Lamons, with Ms. Stinson, even talks to [Defendant] at the vehicle; extensively getting everybody's version of events of what happened.

Then after he considers all of that, he goes and talks to Officer Pruett. I'm assuming his supervisor on duty at that time, about, you know, "This is what I've found out. These are the facts and these are the witnesses' statements, et cetera. Not going to charge him with trespassing or not being here when he was supposed to, because I've now found out that Mrs. Lamons gave him permission to come back, but I am arresting him for simple battery."

Now, whether they - - officers could have or should have arrested Ms. Stinson for assault or battery, it's really not relevant for the purposes of "could they have," and did they have reasonable cause to arrest [Defendant] for simple battery at that time.

. . . .

But even if it was probable cause, to me, there's no question [Defendant] admitted to putting his hands around Ms. Stinson's neck . . . . He did admit to choking her. He admitted to - - they got into a physical altercation.

. . . .

So [Defendant] and everybody else there that day, including Mrs. Dorsina Lamons and Mr. Robert Lamons, seem to confirm that [Defendant] was the instigator of this incident by verbally assaulting Ms. Stinson.

And for that matter, everybody's testimony seemed to be very consistent, including Ms. Stinson, that she was the first one that actually touched each other when she pushed Mr. Lamons.

So the question is: Did Officer Crouch have reasonable cause to have arrested [Defendant] for simple battery at that moment in time when he went out to the car and told him, "You're now under arrest for simple battery"? And the answer to that question is very clear; yes.

And, to me, that is the primary issue when it comes to the rolling papers that were found in an officer-safety pat down when he was detained, or when [Defendant] was taken to the Beauregard Parish Jail and marijuana and meth were found on his person, and when subsequent to that, the officers went back and looked in the police unit where the last person has been was [Defendant].

And you can clearly see on the video [Defendant] is taking something out of his pants and putting it on - - dropping it on the floor and he's shuffling his feet to - - in what appears to be an effort to push that item under the seat where he's sitting, which is exactly where the officers testified that they found that evidence.

So that clearly is admissible. So that set of evidence at the initial detention, arrest in the house, at the jail and in the police unit, I am denying the Motion to Suppress.

Then we turn to the other evidence that is sought to be suppressed that was seized from the white pickup truck or the house at . . . 1203 North Texas[.]

So the question there is multifaceted in the sense of the time frame of when was the permission to search? Was the permission to search signed; the consent valid? Was there a search warrant or are there other matters of law that come into play?

So it seems like the timeline is that the officers got there somewhere after the noon hour. The database audit trail clearly indicates that Officer Guillory logged into her computer at 1:07 p.m. and created the search warrant. That was forwarded to Judge O'Neal at 2:05 p.m. Unfortunately, it wasn't viewed by Judge O'Neal until 5:43 p.m. and signed by her at 5:45 p.m.

So I think the Lamons are absolutely correct. They were never presented with a search warrant. There was no search warrant signed prior to the search being done of the truck and the house. Officers testified that they had already left the Lamons' house at the time - - by the time Judge O'Neal had signed the search warrant, because they

14

searched after 4:14 p.m. when Mr. Robert and Mrs. Dorsina Lamons signed a consent to search.

And I don't think there seems to be much dispute that the officers secured the scene and stayed there in the Lamon's home from, I guess somewhere prior to 1:07 p.m., sometime . . . after lunchtime until the consent . . . to search was signed around 4:14 p.m., and then they completed their search and then they left.

So - - and obviously they've testified by the time they got the search warrant back at 5:45 they had already left and gone and that's why they didn't give the Lamons a copy of the search warrant. They didn't have a search warrant to give them because they hadn't gotten one.

Mr. and Mrs. Lamons both confirmed that none of the officers searched throughout the house or searched throughout the truck until after they signed the consent form.

The only discrepancy to that is, Mrs. Lamons said she saw the officers look in the truck and open the doors to the truck prior to her signing the permission to search, which was directly contradicted by the testimony of Mr. Robert Lamons, who testified as to what he did or didn't see. And his exact words was his wife couldn't get up to see anything.

So her testimony that she walked to the door or the window to see what the officers was [sic] doing outside seems to be directly contradictory to Mr. Robert Lamons' testimony that she never got up to go see what they were doing outside because she was laying down, or physically in pain I think was described, so.

And even her own testimony confirmed that the officers didn't go searching throughout the truck, looking in stuff. They just - - what would be what legally is called the plain-view doctrine.

They have the right to go look at the truck and anything they can see with their naked eye without going digging around, opening the glove box or the center console or looking up under the dash; they don't need a search warrant for or permission for that matter.

So there doesn't seem to be anything that the officers did illegally or unconstitutionally at that point.

. . . [H]e pointed out that the time stamp on the photographs jpeg files that were downloaded from the SD card showed that those photos of the evidence was [sic] taken at between [sic] 3:32 p.m. and 3:43 p.m., which would - - if that is absolutely accurate would

15

indicate that those - - that that evidence was searched and found and photographed prior to the consent form being signed at 4:14 p.m.

But that's the only suggestion that any search was conducted prior to the consent form being signed. All direct testimony from all witnesses is to the contrary, so - - it's ambivalent at best.

I suspect that the camera time was not modified for daylight savings time or nondaylight [sic] savings time and that the photographs were actually taken at 4:32 and four - - - through 4:43. Because again, the officers all testified that they were gone by 5:45 when the search warrant was finally signed by Judge O'Neal.

. . . [N]either Officer Hunt or Officer Hinton testified that they could confirm that the time stamp on the file was accurate, in that that was the exact time that the - - in fact, they said they couldn't say that that was accurate. All they could say and confirm through their oral testimony was that they didn't search until after Mr. Robert Lamons and Mrs. Dorsina Lamons signed the consent to search.

So the only other questions that at that time is: Was the consent by Dorsina Lamons and Mr. Robert Lamons invalid in some way because they were forced or compelled through threat of force?

They both testified they felt like they were a prisoner in their own home, and I - - you know, I can understand that. I can see that. If I were in their shoes and there were three or four or five officers in my home for three hours refusing to leave, I would feel uncomfortable with that, too, but I don't think that that rises to the level of making the consent illegal or that it was forceful.

And I'll say this, Mrs. Dorsina Lamons testified that she told them to get the hell out of her house. Mr. Robert Lamons directly contradicted that and said he never told them to leave the house. I don't think he was asked whether he heard Mrs. Lamons say that or not, but I suspect if he ha[d] he would have . . . remembered it, he would have said so.

Mrs. Lamons' testimony. . . . She's had all kinds of medical issues, is on medications, but, you know, she talked about things like, they didn't even leave the residence with [Defendant] in the cop car until after they had done the search. She had things so confused about time frames and what happened . . . she's just wrong on that.

The video evidence clearly shows that they left with [Defendant] and it was, at least according to Mr. Robert Lamons, 30 minutes to an hour before the officers ever came back and then it was another three hours o[r] more before they did the search and then they finally left.

16

So Mrs. Lamons' recalling of this story that [Defendant] was out in the car from eleven o'clock that morning until 4:30 or so that afternoon and that they didn't leave with [Defendant] in the car until after they had done their search and all that, that's just a confusion of the events.

. . . .

So I don't feel that the signing of the permission to search was such duress or threat of force or violence or some - - not even allegations that there was any threats of that, so I find that the permission to search consent was valid.

I will say that even if they had searched prior to the permission being signed or if the permission to sign had been improperly obtained and was not consensual, the law is clear that under what's called the inevitable discovery rule, then the evidence is not inadmissible at court because the officers applied for and obtained a valid search warrant.

. . . .

The law enforcement officers in this case did what they were supposed to. They asked for permission. They were denied permission. They immediately prepared and submitted a search warrant to a judge. They secured the scene; they didn't search; they waited until permission was granted and/or a search warrant was signed.

Did that take way longer than it usually does? I think so, but that doesn't render their efforts unconstitutional or illegal.

So even if they had improperly searched based upon the permission to search, the law is clear that the evidence would be admissible anyway under the inevitable discovery rule, so I'm going to deny the Motion to Suppress.

The audio and video evidence was also introduced at the suppression hearing. Specifically, the State played audio from the 9-1-1 call. On the 9-1-1 call, Stinson can be heard telling the officer she was just assaulted by Defendant. The call was forwarded to city police. Stinson told the officer that she was assaulted by Defendant, that she was with Defendant's parents as a caretaker, and Defendant had since left the home in a white truck.

17

The State also played the bodycam footage from Officer Crouch. At the start of the video, Crouch radioed in that the white Ford truck was located in the driveway and provided the license plate number. An officer radioed back that Dorsina Lamons was the registered owner of the vehicle. Crouch then made contact with Stinson who confirmed she had called. Stinson said she worked at the residence, and she was taking care of the client when Defendant came in "talking noise to me." Crouch asked if Defendant was inside the house, and Stinson confirmed he was. Crouch radioed in that Defendant was located in the residence as he could hear Defendant inside. Stinson said Defendant was all in her face, so she pushed him lightly. At two minutes and six seconds, Crouch radioed back in that Defendant sounded agitated, and he was notifying them in case Defendant decided to fight. Crouch also confirmed he believed Defendant was trespassing in violation of the trespass order. It is worth this court noting that Defendant can be heard in the background yelling and screaming inside the house from about two minutes and six seconds until two minutes and forty-three seconds. Stinson continued with her statement and said Defendant pushed her back and was choking her. Stinson said they started fighting, but Defendant's mother could not do anything because she was sitting in the wheelchair. Stinson said after the fight she went to get Defendant's dad, but Defendant left the residence and had just returned. Crouch responded that he wanted to get Defendant secured and wait for another officer because Defendant "tends to get out of hand sometimes, and I know he's been also known to carry weapons in the past." Crouch said as soon as he finished securing and talking to Defendant, he would come back and talk to her. Crouch asked if she was present the other day when the other officers had to be dispatched to the residence, and Stinson confirmed that she was. Stinson further

18

stated Defendant's mother had called the police on him during the first incident. At approximately five minutes and fourteen seconds, yelling can be heard coming from the residence. Crouch then asked Stinson to repeat the incident. Stinson said Defendant became loud with her, started cursing at her, and got in her face. Stinson said, "When he called me a bitch, I pushed him away." Stinson said she was standing up when Defendant got in her face. After pushing him away, Stinson said Defendant then pushed her and started choking her so, she fought back. Crouch asked if she had any marks on her neck, and Stinson said she felt like she did and pointed to a spot along her neck.

At approximately six minutes in, Defendant can be seen exiting the house and walking outside. Crouch noticed Defendant, walked towards him, and asked what was going on. Defendant ignored Crouch, turned around, and headed back up the ramp to walk inside the house. Crouch said, "I need to talk to you man, come here." Defendant did not comply and instead moved back into the house. Defendant can be overheard saying something along the lines of, "See what you did. See what she did." Defendant can be overheard using a very loud and aggressive tone as Crouch was walking up the ramp, and the door to the house was swinging and not completely closed as Crouch entered the house. Defendant can be seen standing in front of his mother who is seated in a wheelchair. Crouch stood in the doorway, told Defendant to "come here," and motioned for Defendant to come to the officer; however, Defendant did not comply and instead said, "I don't want to come out there. I want to speak in front of my family." The officer said, "Okay" and entered the house and stated, "You were issued a trespass warrant not to come back to this property." Crouch and his partner then turned Defendant around and secured his hands. While this was going on, Defendant continued to

19

yell and act belligerently but said he had permission to be there. As the officer attempted to grab Defendant by the arm, Defendant jerked away, fell to his knees, and refused to comply with the officer. Crouch told the Defendant to stop, but Defendant continued to yell, "Why the cuffs still on?" Defendant then continued talking and tried to explain the situation, and Crouch said he was taking Defendant outside to talk to him. Crouch told Defendant he was going to figure out what was going on. When Defendant was escorted outside, Defendant said let me stay right here, but Crouch said, "No, you don't get to make those choices." Defendant began moving his arms as Crouch attempted to escort Defendant to the patrol until. At ten minutes and forty-seven seconds, Crouch informed Defendant that he was in handcuffs because of the trespass issue.

Crouch then asked Defendant to tell his side of the story. Defendant stated he had an argument with his mother the other day and Stinson jumped up and got involved. Defendant said Stinson kept giving him dirty looks, but he wanted to clear the air. Defendant said he called her "little girl" in a mean way, but Stinson jumped up and pushed him several times. Defendant said she was swinging her fist, so he grabbed her. Defendant said he let her go, and Stinson had no business jumping up and getting involved. At fourteen minutes and six seconds, Defendant admitted that he had one hand around her neck and one hand around her shoulder. Defendant said he grabbed her again because Stinson swung again. Defendant admitted that he had a criminal history, but the cops coming the other day made it worse.

Following the conversation with Defendant, Crouch met with the officer who reported what Defendant's mother said. The officer stated Defendant's mother said Defendant was close to Stinson, but Stinson was the one who pushed

first, and then Defendant grabbed her. At seventeen minutes and forty-six seconds, Crouch told the other officers Defendant was barred from the house because the mother signed the letter, but the mother had invited Defendant back. Crouch told the other officers he had prior dealings with Defendant, and there is a problem every time Defendant is involved. Crouch confirmed that he had to draw his gun on Defendant during a prior incident.

At twenty-one minutes and forty-five seconds, the officers made contact with Stinson again. Stinson stated Defendant arrived at the home around 10:30 a.m., grabbed something, and left. Then Defendant came back and talked to Stinson. Stinson stated Defendant got loud, called her the "b word," and got in her face. Stinson said she pushed him away, then Defendant pushed back and started choking her. When asked how close was he, Stinson said Defendant was very close to her face, nose to nose with her, yelling and screaming, and cursing. Stinson said Defendant told her that he was going to call people to come "beat her ass." Stinson said she pushed Defendant to get him out of her face. Stinson said Defendant pushed her back and tried to choke her out with a hand on her neck and another on her shirt. Stinson said she choked Defendant back and hit him, and Defendant hit her back. Stinson said she threw a coffee mug and grabbed a knife because she was scared, but she left and called for help. Stinson said Defendant used a closed fist to strike her, and she used the same.

At twenty-seven minutes and fifteen seconds, Crouch finished talking with Stinson and approached Mr. Lamons. Lamons said he was in the shower so he did not witness the fight. Lamons said his wife signed a paper regarding the no trespass order, but she had invited Defendant over to the house immediately the next day and allowed him to stay the night. At twenty-eight minutes and fifty-five

21

seconds, Crouch inquired as to Mrs. Lamons wife's mental state, and Lamons informed the officer he did not believe his wife was in her right mind. Lamons said his wife might not even remember the conversation.

At thirty-one minutes and twenty-one seconds, Crouch spoke with Mrs. Lamons. Crouch informed Mrs. Lamons that Defendant was detained in the car pending the outcome of the investigation. Crouch informed her that detained is not the same as being arrested. Mrs. Lamons said she was sitting in the kitchen with Stinson when Defendant came in. Mrs. Lamons said Stinson and Defendant exchanged words before Stinson jumped up and pushed Defendant. Mrs. Lamons said Defendant pushed her back and that's when the fight started. Mrs. Lamons said she kept telling them to stop. Mrs. Lamons admitted she signed the criminal trespass order a few days before against Defendant, but she invited Defendant to come back because he did not have a place to stay.

Crouch then met with the other officer and relayed information obtained from the investigation. Crouch told the officer he learned Defendant confronted Stinson about the lack of care she provided and exchanged inflammatory words with her and got in her face. The other officer said Stinson told him when Defendant was in her face, she was afraid Defendant might strike her, so she shoved him. The other officer said Stinson told him Defendant followed her outside. At thirty-nine minutes and forty seconds, Crouch acknowledged Mrs. Lamons negated the trespass order by inviting Defendant back, so they could only arrest Defendant for simple battery.

At forty-minutes, Crouch approached Stinson's manager and said he did not think there would be peace if Defendant was around. The manager stated Defendant's mother had changed her story several times. Crouch admitted to the

22

manager that he had been called out to this same residence to handle Defendant on numerous occasions, and some of those occasions involved violence. Crouch stated Defendant has a history and that his mother takes his side, so Defendant's father does not want to get in the middle of it. Crouch stated the home is not safe while Defendant is there.

At forty-four minutes and fifty-two seconds, Crouch returned to his patrol unit and informed Defendant that he was under arrest for simple battery. Crouch then informed Defendant of his *Miranda* rights.

**ASSIGNMENT OF ERROR NUMBER ONE:**

In Defendant's first assignment of error, he argues the trial court erred in denying his motion to suppress and his first amending motion to suppress. Defendant claims the trial court's determination that he was the aggressor was flawed and calls into question the overall analysis of whether the officers had reasonable cause to arrest him. Defendant argues that because his arrest was unlawful, then the subsequent search and seizure was illegal and inadmissible as fruit of the poisonous tree.

In response, the State argues that the trial court made a very careful analysis of the factual and legal issues and did not abuse its discretion in denying the motion to suppress. Further, the State argues that once the trial court concluded that Officer Crouch had probable cause for the arrest of Defendant for simple battery, everything else that happened flowed from the lawful arrest.

"On appeal, we review the entire record to determine the correctness of a trial court's ruling on a motion to suppress, affording great weight to a trial court's denial, which will not be set aside 'unless a preponderance of the evidence clearly favors suppression.'" *State v. Griffin*, 16-424, p. 15 (La.App. 3 Cir. 4/19/17), 217

23

So.3d 484, 498, *writ denied*, 17-1027 (La. 3/2/18), 269 So.3d 708 (quoting *State v. Snelling*, 09-1313, p. 2 (La.App. 3 Cir. 5/5/10), 36 So.3d 1060, 1064, *writ denied*, 10-1301 (La. 12/17/10), 51 So.3d 16.)

In *State v. Brisban*, 00-3437, pp. 4-6 (La. 2/26/02), 809 So.2d 923, 927-28, the supreme court held:

> The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Similarly, the Louisiana Constitution provides that "[e]very person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy." La. Const. art. 1, § 5. Warrantless entries into the home for arrest or seizure are invalid in the absence of exigent circumstances. *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The Fourth Amendment has drawn a firm line at the entrance to the home, and a police officer therefore needs both probable cause to arrest or search and exigent circumstances to justify a non-consensual warrantless intrusion into a private premises. *State v. Talbert,* 449 So.2d 446 (La.1984); *State v. Hathaway,* 411 So.2d 1074 (La.1982). Probable cause to arrest without a warrant exists when the facts and circumstances known to the arresting officer are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed or was committing a crime. *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); La.C.Cr.P. art. 213; *State v. Raheem,* 464 So.2d 293 (La.1985). Exigent circumstances may arise from the need to prevent the offender's escape, minimize the possibility of a violent confrontation which could cause injury to the officers and the public, and preserve evidence from destruction or concealment. *State v. Hathaway,* 411 So.2d 1074 (La.1982).
>
> The curtilage of a home, that "area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life," is considered part of the home itself and is therefore afforded Fourth Amendment protection. *Oliver v. U.S.,* 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984) (internal quotation omitted). The front porch of a private residence falls within the curtilage of the home and is therefore accorded Fourth Amendment protection. *State v. Deary,* 99-0627, p. 1 (La.1/28/00), 753 So.2d 200, 201. A front porch does not necessarily enjoy the same measure of Fourth Amendment protection that a home does, however, because of "an almost implicit understanding and custom in this country that, in the absence of signs or warning, a residence may be approached and the occupants summoned to the door by knocking." *Deary* at p. 1,

24

753 So.2d at 201 (citing *State v. Sanders,* 374 So.2d 1186, 1189 (La.1979)).

In *State v. Bates*, 51,890, pp. 6-9 (La.App. 2 Cir. 2/28/18), 246 So.3d 672, 677-79, the second circuit provided a relevant discussion on exceptions to the search warrant rule:

> In general, the Fourth Amendment prohibits the police from entering a private residence without a warrant. However, the existence of exigent circumstances is among the recognized exceptions to the general warrant requirement under the Fourth Amendment; thus, a warrant is not required for a search under the Fourth Amendment when exigent circumstances exist. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *State v. Hemphill,* [41,526 (La.App. 2 Cir. 11/17/06), 942 So.2d 1263, *writ denied*, 06-2976 (La. 3/9/07), 949 So.2d 441]. Absent exigent circumstances, a warrantless entry into a home to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within. *Groh v. Ramirez*, 540 U.S. 551, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004). On the other hand, exigent circumstances justify a warrantless entry, search, or seizure when "police officers, acting on probable cause and in good faith, reasonably believe from the totality of the circumstances that (a) evidence or contraband will imminently be destroyed or (b) the nature of the crime or character of the suspect(s) pose a risk of danger to the arresting officers or third persons." *State v. Warren,* 2005-2248 (La. 2/22/07), 949 So.2d 1215; *United States v. Kunkler*, 679 F.2d 187 (9th Cir.1982).
>
> Whether exigent circumstances exist is largely a factual question; thus, our review of a district court's finding of exigent circumstances based on specific findings of fact is subject to the manifest error standard of review. When reviewing the trial court's ruling on a motion to suppress, the appellate court may review the entire record, including testimony at trial. *State v. Howard*, [49,965 (La.App. 2 Cir. 6/24/15), 169 So.3d 777, *aff'd*, 15-1404 (La. 5/3/17), 226 So.3d 419]; *State v. Monroe*, [49,365 (La.App. 2 Cir. 11/19/14), 152 So.3d 1011].
>
> Hearsay rules do not apply in hearings on motions to suppress evidence. La. C.E. 1101(B)(4); *State v. Shirley*, 08-2106 (La. 5/5/09), 10 So.3d 224. . . .
>
> It is also well settled that a warrantless search conducted pursuant to a valid consent is permitted by the Louisiana and U.S. Constitutions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct.

25

2041, 36 L.Ed.2d 854 (1973); *State v. Raheem*, 464 So.2d 293 (La. 1985). To be valid, consent must be (1) free and voluntary, in circumstances that indicate the consent was not the product of coercion, threat, promise, pressure, or duress that would negate the voluntariness; and (2) given by someone with apparent authority to grant consent, such that the police officer reasonably believes the person has the authority to grant and consent to the search. *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *State v. Howard*, *supra*.

Additionally, a valid consent rehabilitates a prior warrantless search. *State v. Bennett*, 383 So.2d 1236 (La. 1979); *State v. Williams*, 353 So.2d 1299, 1304 (La. 1977), *cert. denied*, 437 U.S. 907, 98 S.Ct. 3098, 57 L.Ed.2d 1138; *State v. Taylor*, 550 So.2d 712, 718 (La. App. 2 Cir. 1989), *writ denied*, 556 So.2d 54 (La. 1990). But if consent was obtained after an illegal detention, intrusion or entry, the consent is valid only if it was the product of a free will and not the result of an exploitation of the previous illegality. Among the factors to consider in determining whether the consent was sufficiently attenuated from the unlawful conduct to be a product of a free will are whether the police officers adequately informed the individual that he need not comply with the request, the temporal proximity of the illegality and the consent, the presence of intervening circumstances and, particularly, the purpose and flagrancy of the official misconduct. *State v. Taylor*, *supra*; *State v. Summers*, 440 So.2d 911 (La. App. 2 Cir. 1983).

### Exclusionary Rule

If evidence is derived from an unreasonable search or seizure, the proper remedy is exclusion of the evidence from trial. *State v. Benjamin*, 97-3065 (La. 12/1/98), 722 So.2d 988. In *State v. Brock*, 47,005 (La.App. 2 Cir. 3/7/12), 91 So.3d 1003, *writ denied*, 12-0784 (La. 9/28/12), 98 So.3d 826, this court stated that the exclusionary rule is designed to safeguard Fourth Amendment rights generally through its deterrent effect, citing *Herring v. United States*, 555 U.S. 135, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009).

As indicated in the case law above, to justify a warrantless intrusion into a private premises, an officer must have probable cause to arrest or search along with exigent circumstances. Probable cause to arrest without a warrant exists when facts and circumstances known to the arresting officer are sufficient to justify a belief that the person to be arrested has committed or was committing a crime. We find Crouch had probable cause to arrest Defendant for several reasons. First,

26

Crouch received information from the police dispatcher about how the victim had been assaulted by Defendant at the residence. The 9-1-1 call indicated Defendant had left the residence in a vehicle, but when Crouch arrived on the scene, the vehicle was present, and Stinson stated Defendant was inside the house. Second, Crouch directly acknowledges on the bodycam footage that he knew about the previous 9-1-1 call and signed trespass order from Defendant's mother who had requested that Defendant be banned from entering the home. When Crouch approached the residence and obtained confirmation that Defendant was in the house, Crouch believed Defendant was in violation of the order and was trespassing. As the investigation and questioning continued, the officers subsequently learned that Defendant's mother had given him permission to return and had revoked the order; however, at the outset, the officers did not know about the permission and assumed Defendant was committing a crime. Additionally, Crouch attempted to speak to Defendant when he came outside of the residence, but Defendant ignored the order and continued back inside the house. Crouch then stopped just in front of the doorway, which had not been closed, and again asked Defendant to step outside, but Defendant refused. Based on these facts, we find there was sufficient probable cause to arrest Defendant upon arriving on the scene and before entering the home.

Since probable cause to arrest has been established, there must have been a sufficient exigent circumstance to justify the warrantless search. We find that Crouch had a sufficient exigent circumstance to enter the home. As indicated in *Bates*, exigent circumstances justify a warrantless entry, search, or seizure when police officers, acting on probable cause and in good faith, reasonably believe from the totality of the circumstances that the nature of the crime or character of the

suspect poses a risk of danger to the arresting officers or third persons. *Id*. As indicated from the testimony and video evidence, the totality of the circumstances showed the following: Crouch and the other officers believed Stinson was the victim of violent acts; Crouch verbally indicated several times that he had past experiences with Defendant and his family at the residence, that Defendant was known to carry weapons, use drugs, and be aggressive and violent, and how Crouch wanted to wait for backup because Defendant "tends to get out of hand"; Crouch verbally noted how Defendant was screaming and yelling from inside the residence, and the screaming can be heard on the bodycam footage; and the officers believed Defendant was actively trespassing inside the residence where Defendant's parents were located. Based on these facts, we find there was reason to believe Defendant posed a risk to the officers or his parents to justify a warrantless entrance into the home and seizure of Defendant's person.

Once the officers completed their investigation, they actively acknowledged Defendant's mother had rescinded the trespass order, so they could only arrest him for simple battery. We find the trial court did not abuse its direction in determining the officers had probable cause to arrest Defendant for simple battery.

The trial court further determined that the search of Defendant's person, which revealed narcotics, was a lawful search. "It is well established searches incident to arrest conducted immediately before formal arrest are valid if probable cause to arrest existed prior to the search." *State v. Sherman*, 05-779, p. 9 (La. 4/4/06), 931 So.2d 286, 292. "Naturally, the fruits of the search cannot be necessary to support the probable cause to arrest. . . . If an arrest is justified before the search, it is not unreasonable for the search to be made before instead of after the arrest." *Id*. Additionally, the officers testified that narcotics were found on

28

Defendant when he was booked at the jail, which prompted Crouch to search the patrol unit where Crouch located more narcotics. "An inventory search of an arrestee's property at the time he is booked is also constitutionally permissible." *State v. Duplantis*, 388 So.2d 751, 753 (La.), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573 (1980). For these reasons, we find the trial court did not err in determining the marijuana and methamphetamine found at the jail and in the patrol unit were admissible.

## ASSIGNMENT OF ERROR NUMBER TWO:

In Defendant's second assignment of error, he argues the trial court improperly ordered that the $1,000.00 fine be paid as a condition of parole. Under the "Sentence" portion of the "Request for Entry of Guilty Plea in Felony Case," it states, "Fine of $1,000.00 + Costs and Fee." The $1,000.00 amount was followed by the initials of the assistant district attorney. However, when the trial court announced the sentence, it stated, "On parole, there is a $1,000.00 fine plus court costs." Defendant argues the trial court does not have the authority to set conditions for parole, so the fine and court costs ordered by the court were improperly imposed as conditions of parole.

Defendant notes that in *State v. Love*, 12-1076 (La.App. 3 Cir. 4/10/13) (unpublished opinion), *writ denied*, 13-1078 (La. 11/15/13), 125 So.3d 1102, this court recognized as an error patent the court's improper order of conditions of parole. Specifically, this court held:

> The trial court lacks the authority to impose conditions of parole. *State v. Franco*, 09-1071 (La.App. 3 Cir. 4/1/09), 8 So.3d 790, *writ denied*, 09-1439 (La. 2/12/10), 27 So.3d 843. In *State v. Kotrla*, 08-364 (La.App. 3 Cir. 11/5/08), 996 So.2d 1224, the trial court ordered as conditions of parole that the defendant undergo substance abuse treatment, pay restitution, and pay the fine and court costs that the court had previously imposed as part of the defendant's sentence. In

finding the trial court lacked the authority to impose these conditions, we stated:

> In *State v. Bradley*, 99-364 (La.App. 3 Cir. 11/3/99), 746 So.2d 263, this court explained that the power to regulate one on parole is vested in a parole board within the Department of Corrections and that a trial court has no authority to impose a condition on a parolee. More specifically, a sentencing court is without authority to impose restitution as a condition for a defendant's future parole. *State v. Douglas*, 576 So.2d 1102 (La.App. 3 Cir. 1991). Additionally, La.Code Crim.P. art. 888 provides that costs and fines shall be payable immediately.

*Id*. at pp. 2-3.

Defendant claims the recommendation did not mention the fine and costs as a condition of parole. Defendant claims the fact that the court mentioned "parole" is sufficient to conclude that the trial court intended the payment of the $1,000.00 fine and court costs to be paid as a condition of any parole that Defendant may receive. Defendant asserts the trial court erred and notes that the commitment order signed by the trial court does not mention the fine and costs. For these reasons, Defendant asserts the sentence should be amended to delete the fine and costs as a condition of parole, and the trial court should be instructed to note the amendment in the court minutes.

In response, the State first argues that Defendant's *Crosby* plea limited his right to appeal the denial of the motion to suppress, so the issue regarding the fine and court costs is outside the scope of his reservation. Second, the State acknowledges that the plea agreement was "inartfully stated by the trial court"; however, despite this, the plea agreement provided for a sentence that included a fine of $1,000.00 plus costs of court and fees, and the trial court imposed that as part of the sentence. The State claims the trial court recognized that the payment of any amount would have to be enforced by the parole board since Defendant was

being sentence to fifteen years at hard labor without any probation. The State argues the trial court was not intending to order the parole board to do or not do any specific act. The State claims Defendant was sentenced properly by the trial court as provided in the written proposal, and there was no error as to the substantial rights of the accused warranting action by this court.

We find that when reading the transcript and reviewing the plea agreement, it is not clear if the trial court intended to impose the payment of the fine as a condition of parole. If the payment of the fine was intended to be a condition of parole, the trial court lacked authority to do so under *Love*. However, as the fine cannot be excised since it was agreed upon by the parties, we remand with instructions to impose a sentence in conformity with the plea agreement provided the imposition of the fine and court costs are not made a condition of parole.

In conclusion, we find the trial court did not err in denying Defendant's motion to suppress. As to the fine, we hereby remand the matter with instructions to the trial court to impose a sentence in conformity with the plea agreement and to clarify that the fine and court costs are not to be made a condition of parole.

**AFFIRMED. REMANDED WITH INSTRUCTIONS.**